**PIZITZ, INC., a corporation, Plaintiff,**

v.

**PIZITZ MERCANTILE CO. OF TUSCA-LOOSA, INC., a corporation, Pizitz-Saks Mercantile Company, a corporation, X, Y, and Z, those persons, firms or corporations operating individually or jointly any one or more stores known by the trade name "Pizitz," Defendants.**

Civ. A. No. 77–G–1582–W.

United States District Court,
N. D. Alabama, W. D.

April 2, 1979.

Thad G. Long, Bradley, Arant, Rose & White, Linda A. Friedman, Birmingham, Ala., for plaintiff.

Olin W. Zeanah, Zeanah, Donald & Hust, Wilbor J. Hust, Jr., Tuscaloosa, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This is an action brought for declaratory and other appropriate relief pursuant to 28 U.S.C. §§ 2201 and 2202. Jurisdiction of this court is invoked under 15 U.S.C. § 1125(a) and 28 U.S.C. § 1338(b), in that plaintiff seeks a declaration of non-infringement and a judicial interpretation of the relative rights of the parties under the law of trademarks and of unfair competition.

This is a most unusual case. Both plaintiff and defendant are in the retail mercantile business. Plaintiff has no outlets within Tuscaloosa County, Alabama; defendant has none without. Plaintiff, Pizitz, Inc., brings this action for adjudication of its dispute with defendant, Pizitz of Tuscaloosa. Plaintiff seeks to enter the Tuscaloosa, Alabama retail market under some form of the name "Pizitz." Defendant contends that the opening of plaintiff's proposed

branch store under any form of the name "Pizitz" will confuse and deceive the public, as well as constitute a fraud upon the defendant.

In arriving at its decision in this case, the court has relied upon the representation of Richard Pizitz, President of Pizitz, Inc., that plaintiff will be willing to take steps to minimize the confusion between plaintiff and defendant. Accordingly, the court is of the opinion that plaintiff has manifested its good faith; the court bases its decision on that finding, and in its Order simply asks plaintiff to do what its president offered to do in his testimony before the court. The proposed Order is attached hereto as Exhibit A.

A Final Order will be entered ten days after these Findings of Fact and Conclusions of Law have been filed. If the plaintiff before then files with the Clerk of the Court an affidavit of agreement to the terms of the proposed Order, the court's finding of good faith will stand and the proposed Order will be entered as a Final Order. If the plaintiff does not file its affidavit of agreement, then the court must conclude that the plaintiff is not acting in good faith, and will enter an Order barring the plaintiff from entry into the Tuscaloosa market under any form of the name "Pizitz," attached hereto as Exhibit B.

The court, after hearing the evidence and considering the briefs of counsel, enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Pizitz, Inc., through its predecessors, was the first business in the state of Alabama to use the name "Pizitz."

2. Pizitz, Inc., was named for its founder, Louis Pizitz, who established plaintiff's business in 1899 in Birmingham under the name "Louis Pizitz Dry Goods Company," and it or its predecessors have been owned and operated by the Birmingham Pizitz family since its establishment.

3. In 1961, at which time plaintiff Pizitz, Inc., knew of defendant's Tuscaloosa opera-

tions, the plaintiff incorporated as "Pizitz, Inc.," in the state of Delaware. Plaintiff operates under the name "Pizitz." Four descendants of Louis Pizitz, plaintiff's founder, are involved full time in the business of Pizitz, Inc., and are officers of the corporation: his son and three grandsons.

4. Plaintiff owns and operates six stores in Jefferson County: downtown Birmingham (the largest department store in the state of Alabama), Bessemer (opened in 1955), Roebuck (opened in 1961), Eastwood Mall (opened in 1966), Five Points West (opened in 1968), and Brookwood Mall (opened in 1975).

5. Plaintiff first expanded outside Jefferson County in 1963 when it opened its store in Huntsville, Alabama. Plaintiff presently owns and operates three other stores outside Jefferson County, all within the state of Alabama: Montgomery (opened in 1972 and moved in 1977), Gadsden (opened in 1974), and Florence.

6. Louis Pizitz, plaintiff's founder, was the uncle of Max Pizitz, defendant's founder. Louis Pizitz consigned merchandise to his nephew on credit to be peddled.

7. Around 1915 or 1916, Max Pizitz bought an interest in a Tuscaloosa business called Saks and Company. Its business name was changed to "Pizitz Mercantile," and in 1918 Pizitz-Saks Mercantile Company was incorporated. Max Pizitz and his son, Sam Pizitz, operated the business under the name "Pizitz Mercantile Company."

8. Defendant Pizitz Mercantile Co. of Tuscaloosa, Inc., and its predecessors have owned and operated in the city of Tuscaloosa an established retail business for more than 60 years, and defendant is the successor to the business started by Max Pizitz in 1915 or 1916.

9. Defendant has operated and advertised extensively under the name "Pizitz" for more than 50 years in Tuscaloosa, starting in the 1920's. Defendant advertises primarily under the names "Pizitz of Tuscaloosa" and "Pizitz Tuscaloosa," which appear on its shopping bags, front doors, and sales tickets.

10. Defendant's predecessor began its business in a store in downtown Tuscaloosa. The building is still in use and remains defendant's largest store. There are two other locations, all in Tuscaloosa: Alberta, in the eastern area (opened in 1966), and McFarland Mall, in the southern area (opened in 1968 or 1969).

11. In 1959 the Tuscaloosa Pizitz family sold its interest in the Tuscaloosa store, and since that time the defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc., has not been owned or operated by anyone bearing the surname Pizitz. From 1959 to 1972, the defendant was owned by Jemison Investment Company of Birmingham, which sold the operation to Jack H. Fraley, who is the present owner. Defendant has acquired all rights to the trade name, goodwill, and assets of its predecessors.

12. For several years, both parties have advertised using the name "Pizitz" in script. Both had previously used block letters in displaying the name "Pizitz;" plaintiff changed its logo from block to script earlier than did defendant; plaintiff subsequently altered the form of its script.

13. Plaintiff's color scheme in the use of its logo is a yellow background, with "Pizitz" written in navy; the dot over the first "i" is colored red. This scheme is used on plaintiff's shopping bags, plastic charge cards, delivery trucks, and charge account statement envelopes.

14. Defendant's name typically appears in its advertising in white script inside a dark (black or Ben Day) rectangle; it has less frequently appeared in dark script against a light rectangular background.

15. Plaintiff Pizitz has had minimal direct contact with Tuscaloosa County in the past: it has not advertised on the radio stations there; it has not advertised on the local television station; it has never been included in the local telephone or city directories; it has never had a bank account in Tuscaloosa County; it has never owned or leased property there; it has never paid taxes in the city or county of Tuscaloosa; it has never been a member of the Tuscaloosa Chamber of Commerce or Better Business Bureau. Plaintiff Pizitz has never participated in any way in civic or community life in Tuscaloosa County or the immediate trade area.

16. Plaintiff Pizitz sends its trucks to deliver furniture and appliances to Tuscaloosa on a regular schedule, one day a week for three weeks out of every four. Plaintiff sends small packages into Tuscaloosa via United Parcel Service and U. S. Postal Service parcel post on a continuous basis.

17. Plaintiff Pizitz has approximately 178,000 of its own "Pizitz" charge card accounts in the state of Alabama. Approximately 1,000 of those customers are permanent residents of Tuscaloosa. Approximately 2,000 students at the University of Alabama in Tuscaloosa have charge privileges at Pizitz, Inc., and around 1,400 of those accounts are active. Pizitz, Inc., has more than 15,000 charge accounts bearing mailing addresses with zip codes to be found within a 40-mile radius of the city of Tuscaloosa.

18. Residents of Tuscaloosa are within about 40 miles of the nearest Pizitz, Inc., store, at Westlake Mall in Bessemer; they are within about 55 miles of any of the other five Pizitz, Inc., stores in Jefferson County.

19. Plaintiff, Pizitz, Inc., spends approximately $150,000 annually on television advertising with stations which represent approximately two-thirds of the Tuscaloosa viewing market. Defendant does little television advertising, all on WCFT–TV, Channel 33, in Tuscaloosa.

20. Plaintiff advertises on five Birmingham-based radio stations which share 22 percent of the Tuscaloosa County radio market. Defendant advertises on five local radio stations: WJRD, WTBC, WTUG, WACT, and WNPT.

21. Pizitz, Inc., spends more than $1,100,000 per year on advertising with *The Birmingham News*, and in recent years has been either the largest or second largest advertiser therein. *The Birmingham News* has a daily circulation of 1,835 and a Sunday circulation of 3,534 in Tuscaloosa County.

22. Plaintiff Pizitz advertises in *The Montgomery Advertiser*, which has Tuscaloosa subscribers.

23. Much of plaintiff's advertising features goods not carried by defendant.

24. Plaintiff, Pizitz, Inc., spends approximately $250,000 per year on direct mail advertising of catalogs and other materials. Defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc., is required by Revlon and Estee Lauder to send their direct mail advertising promotions in defendant's billing statements as a condition to defendant's right to carry their lines. Defendant does not have any store catalogs, and does no other direct mail advertising.

25. Defendant advertises in *The Tuscaloosa News* (with a daily circulation in Tuscaloosa County of 28,500), *The Graphic*, and *The Crimson White*, all of which are located in Tuscaloosa County. Plaintiff advertises in none of these newspapers.

26. Defendant has advertised also in high school and college publications, church programs, veterans' programs, civic organizations' function programs, police and fire programs, and other publications in Tuscaloosa and the surrounding market area. Defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc., has appeared in the Tuscaloosa telephone and city directories for 20 years. Defendant has used billboard advertising approximately once a year around Christmas time.

27. During the first year in Tuscaloosa, plaintiff, Pizitz, Inc., intends to spend at least $300,000, and as much as $350,000, in local advertising. This will be in addition to the amounts currently spent on advertising which reaches the Tuscaloosa market. Defendant spends less than $60,000 a year in media advertising, exclusive of employees' salaries.

28. Plaintiff, Pizitz, Inc., is and has been well known to Tuscaloosa residents. Every witness who testified before the court professed to be familiar with or aware of the stores of Pizitz, Inc. The consumer awareness survey conducted by Drs. Mason and Mayer indicated that 72 percent of Tuscaloosa residents are "aware of a store or stores in the Birmingham area known as Pizitz."

29. Defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc., has long enjoyed a good reputation with the public; it is perceived as being a leading store in Tuscaloosa County. In a survey respondents recognized each of its three stores as a leading retail store in the area. In plaintiff's survey 95 percent of all respondents said they were familiar with the defendant.

30. Plaintiff, Pizitz, Inc., accepts Visa and Master Charge cards in its stores outside Jefferson County. Upon the opening of its stores in Gadsden and Florence, about 12,000 local residents applied for and received charge card approval. Defendant has between 4,700 and 8,000 of its own active charge accounts.

31. Plaintiff has signed a lease to be a tenant in a regional shopping mall ("University Mall") to be constructed in Tuscaloosa. Under Section 3.3 plaintiff is obligated to open a store "under the name of PIZITZ, unless prohibited by court order." Section 3.3 of plaintiff's Montgomery lease, executed in 1976 with the same developer, obligates plaintiff to open "under the name of PIZITZ." Its University Mall lease provides for the use of another name as agreed upon by plaintiff and the landlord, if plaintiff is judicially forbidden from using the name "Pizitz." There is also a sublease clause in Section 6.4(a) of the University Mall lease which allows plaintiff to negotiate, subject to the approval of the landlord, a sublease if prohibited from using the name "Pizitz."

32. The proposed location of the plaintiff's store will be inside a triangle made by the defendant's existing locations.

33. Plaintiff has been approached by developers of new malls in Anniston, Decatur, Jasper, Mobile and Dothan.

34. Plaintiff, Pizitz, Inc., proposes to occupy 93,000 square feet in its Tuscaloosa store, to be comparable to its Brookwood Mall store, an "anchor" department store in a regional shopping mall. None of defend-

ant's stores are anchor department stores in malls.

35. Plaintiff operates "department stores;" defendant's stores are primarily women's apparel shops, also known as women's ready-to-wear specialty shops.

36. Defendant's three stores total approximately 32,500 square feet. Its downtown store is the largest and covers approximately 22,000 square feet.

37. Defendant's stores offer merchandise which defendant has placed into 28 categories. Plaintiff would carry all or substantially all of defendant's categories of merchandise, and many of the same brand names, with the exception of piece goods, or fabrics. In many instances, the quality and prices for the common lines of merchandise sold by both parties are similar or identical.

38. Plaintiff offers merchandise not sold by defendant, including furniture, appliances, men's wear, television sets, radios, cameras, rugs, crystal, silver, fine jewelry, toys, sporting goods, lamps, pictures and mirrors, phonograph records, books, stationery, greeting cards, men's and women's shoes, baked goods, maternity wear, and other items. The majority of floor space in plaintiff's Tuscaloosa store will be devoted to items not carried at all by defendant.

39. Sales of goods not carried by defendant constitute more than half of plaintiff's total sales state-wide. Last year, at plaintiff's Brookwood Mall store, goods not carried by defendant made up approximately 51.6 percent of the total sales.

40. Plaintiff maintains a policy to accept returns of its merchandise at any time; defendant does not have a policy always to accept returned items.

41. Plaintiff offers free gift wrapping services; for wrapping reduced-price merchandise, defendant charges a fee.

42. One of the two largest categories of plaintiff's sales is women's ready-to-wear and accessories. Plaintiff's stores have a proportionally larger percentage of their women's clothing devoted to junior dresses than do defendant's stores. Although plaintiff carries clothing for all ages and types of women, its merchandising emphasis is on the younger, fashion-conscious woman. Defendant's primary emphasis and appeal is to the mature, conservative woman.

43. In the survey offered by plaintiff, 90 percent of the respondents replied that they knew the types of merchandise available in the stores of defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc. Nineteen percent of those who responded replied that different merchandise was carried at the two companies' stores, and 21.7 percent perceived no similarities between the two operations.

44. There are ten Pizitz, Inc., stores in the state of Alabama. They are located in counties which support more than one-third of the total population of Alabama. Almost 40 percent of the population of the state lives within SMSA's or counties in which Pizitz, Inc., has stores. Because shoppers will travel considerable distances for major home purchases such as furniture, appliances and other department store items, particularly to stores located within regional shopping malls, all of Alabama north of Montgomery is conveniently served by plaintiff's stores. Virtually every person in Alabama, except those in the southwest area near Mobile, lives within 100 miles of a Pizitz, Inc., department store.

45. The trade area of defendant includes the counties of Tuscaloosa, Greene, Hale, Pickens, and Fayette. This is also the trade area of the proposed University Mall.

46. There are approximately 38,000 households in Tuscaloosa County.

47. Retail sales in Tuscaloosa County increased by 57 percent between 1972 and 1976. Apparel retailers' sales grew by 29 percent.

48. Retail sales in Tuscaloosa County increased by approximately 10.6 percent from 1976 to 1977. Apparel retailers' sales grew by 7.5 percent.

49. Since Mr. Fraley acquired defendant in 1972, defendant's gross sales have remained relatively level from year to year, the aggregate increase of 1978 sales over 1972 sales being 6.2 percent. In recent

years, defendant's aggregate gross sales have been in excess of $1.3 million annually.

50. Plaintiff, Pizitz, Inc., has no desire to injure defendant's business, and seeks to operate in Tuscaloosa under the motivation of general business interests. Plaintiff is not motivated by any intention to deceive or mislead the public or to trade upon the reputation and goodwill of defendant. Rather, plaintiff has expressed the sincere belief that it is in its best business interest to avoid any confusion between itself and defendant.

51. "Pizitz of Alabama" would not be as distinctive as "Pizitz of Birmingham." "Birmingham" is more distinct from Tuscaloosa than is "Alabama." Whereas only 29.5 percent of the respondents to plaintiff's survey associated "Alabama" with the plaintiff, 79.8 percent identified the plaintiff with "Birmingham."

52. The name "Pizitz" has a secondary meaning possessed by both parties in Tuscaloosa County: It is unnecessary to find which is the stronger or weightier.

53. The practical considerations of convenience to the plaintiff in using the name "Pizitz of Alabama" are far outweighed by the much greater potential mischief in the more significant confusion which would result if the plaintiff were to be allowed to operate in Tuscaloosa as "Pizitz of Alabama, Inc."

54. The defendant will inescapably be hurt by the development of the new mall, with four anchor stores, one of which is to be a full-line department store of 93,000 square feet, regardless of the name under which it operates.

55. The campaign promised by plaintiff and mandated by the proposed order of the court, attached hereto as "Exhibit A," will reduce to a *de minimis* level the confusion between plaintiff's and defendant's operations in Tuscaloosa County.

56. Any remaining confusion may actually benefit the defendant. One store obviously would benefit, and plaintiff's proposed $300,000 advertising budget will far outstrip defendant's $60,000 budget. De-

fendant's employees testified that defendant often finds customers in its stores who think they are patronizing plaintiff.

57. Either store should be able to capitalize on any confusion, to "sell" the customers who come into one store, mistaking it for the other. The testimony of the defendant's employees showed that the defendant had in the past sold to those customers who mistook defendant's operations for those of the plaintiff.

58. The proposed order, attached hereto as "Exhibit A," merely echoes the testimony of Richard Pizitz, the President of Pizitz, Inc., before this court. It simply commands him to follow the procedures he then and there promised to follow.

59. By filing its agreement to adhere to the promises made by its president under oath before this court, the plaintiff shall evince its good faith. Failure so to agree shall be conclusive evidence of plaintiff's bad faith.

60. Unquestionably, some confusion will result. Not everyone will read his mail, listen to his telephone, or attend to advertisements carefully. But the campaign which the plaintiff offered and which is suggested by the court should reduce such confusion below the level which this court should be asked to resolve.

## CONCLUSIONS OF LAW

1. *Jurisdiction*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), has been held to apply to trade names, so long as the conduct complained of was a form of unfair competition similar to trademark infringement. In *Rare Earth, Inc. v. Hoorelbeke*, 401 F.Supp. 26 (S.D.N.Y.1975), a dispute over the name of a musical group between two of its factions was found to have jurisdiction under Section 43(a):

Section 43(a) of the Lanham Act was enacted by Congress to protect persons engaged in interstate commerce from the kind of unfair competition wherein a false designation of origin or false description or representation is employed;

unfair competition which is akin to the misuse of trademarks.

401 F.Supp. at 37–38.

Many courts have sustained jurisdiction under Section 43(a) of the Lanham Act where trademarks were not involved, taking an expansive view of the statute. *See,* for example, *National Lampoon, Inc. v. American Broadcasting Co.,* 376 F.Supp. 733 (S.D.N.Y.1974), affirmed 497 F.2d 1343 (2nd Cir. 1974) (misappropriation of the name "Lampoon" held actionable); *Midwest Packaging Materials Co. v. Midwest Packaging Corp.,* 312 F.Supp. 134 (S.D.Iowa 1970) (similar-looking stock certificates); *Harrison Services, Inc. v. Margino,* 291 F.Supp. 319 (S.D.N.Y.1968) (sale catalog); *Burger King of Florida, Inc. v. Brewer,* 244 F.Supp. 293 (W.D.Tenn.1965) (holder of trademark "Whopper" allowed to proceed against user of trade name "Whopper Drive-In").

This court, moreover, has allowed an action to proceed under Section 43(a) of the Lanham Act where only a trade name was involved, where, as here, the name affected represented public identity and goodwill. *Eli's, Inc. v. Crumpton* (N.D.Ala., CA 77–P–123–E, decided Feb. 23, 1977).

Additionally, there are trademarks of the type involved here. Section 45 of the Lanham Act defines "trademark" as follows:

The term "trade-mark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

15 U.S.C. § 1127. Plaintiff, Pizitz, Inc., markets some clothing under its private "Pizitz" label, which would thus constitute a trademark. And it has been held that usurpation of such labels is actionable under Section 43(a). *J. C. Penney Co., Inc. v. Parrish Co., Inc.,* 339 F.Supp. 726 (D.Idaho 1972). Indeed, these labels are protected trademarks despite the outside manufacture of the garments to which they are affixed. The Sixth Circuit has held this way in *E. F. Prichard Co. v. Consumers Brewing Co.,* 136 F.2d 512 (6th Cir. 1943), a case dealing with beer under private brand:

It is sufficient, as regards, the claim of ownership in the trade-mark, that the goods are manufactured for the claimant, or that they pass through his hands in the course of trade and that he gives to them the benefits of his name and business style. . . . [I]t is sufficient that the goods are manufactured for him and that he owns or controls the goods which he offers for sale, and upon which he places a trade-mark or trade name.

136 F.2d at 519. This was also the view of the United States Supreme Court in *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888), where it was said that:

The fact that Holt & Co. were not the actual manufacturers of the flour, upon which they had for years placed the brand in question, does not deprive them of the right to be protected in the use of that brand as a trademark.

128 U.S. at 520, 9 S.Ct. 143, 144.

The court finds, therefore, that jurisdiction over this action is proper under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Having found the present cause to be properly actionable under the Lanham Act, the court must also hear the related claims of unfair competition. At 28 U.S.C. § 1338(b) the district court is provided with "original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the [trade-mark laws]." The issue before the court under Section 43(a) could scarcely be termed insubstantial. And the court finds the unfair competition claims to be related. The test for a "related claim" refers to the probative facts; both the Lanham Act and the unfair competition questions must rest on substantial identity of those facts. However, they need not be exactly the same. *Wham-O-Mfg. Co. v. Paradise Mfg. Co.,* 327 F.2d 748 (9th Cir. 1964); *O'Brien v. Westinghouse Electric Corp.,* 293 F.2d 1 (3rd Cir. 1961); *see also, Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). In the present case,

involving as it does such complex factual and close equitable considerations, it would be unjust for this court to attempt anything less than a full adjudication of the controversy. This necessarily would involve the issue of unfair competition.

## 2. *Declaratory Relief*

■ As to the appropriateness of declaratory relief in this action, we look first to the statutory provisions under 28 U.S.C. § 2201:

> In a case of actual controversy within its jurisdiction [any court of the United States] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

The threshold concern focuses on the existence *vel non* of an "actual controversy." Plaintiff, Pizitz, Inc., proposes to commit an act—entering the Tuscaloosa market under some form of the name "Pizitz"—which defendant, Pizitz Mercantile Co. of Tuscaloosa, Inc., claims will violate its rights. Thus the court is faced with a putative infringement in an inchoate state. Before proceeding further and expending more time and money with this act, the plaintiff seeks to have its rights declared under the Lanham Act.

An analogy may be drawn from a patent case decided by the Eighth Circuit. In *Sherwood Medical Industries, Inc. v. Deknatel, Inc.*, 512 F.2d 724 (8th Cir. 1975), plaintiff had invested a large sum in preparation for marketing a product which the defendant alleged would be an infringement. Plaintiff sought a declaration of non-infringement, and the court of appeals reversed the trial court's finding of a lack of an actual controversy. The court said:

> [T]o determine whether or not there is an "actual controversy" courts should make a pragmatic judgment, aware of the business realities that are involved.

512 F.2d at 728. There were no actual legal procedures initiated by the defendant, but the plaintiff relied on inferences it drew from past actions by the defendant and statements by its attorney and one of its employees. This was enough, the court said:

> [I]t must be concluded that Sherwood has good reason to believe that Deknatel will sue or threaten to sue it for patent infringement if it commences marketing its chest drainage device. The existence of this "reasonable apprehension" establishes that there is an "actual controversy" between the parties.

512 F.2d at 729. The court reached its conclusion in light of an expansive view of the Declaratory Judgment Act:

> [T]hat the Declaratory Judgment Act should be liberally construed to accomplish its purpose of providing a speedy and inexpensive method of adjudicating legal disputes without invoking coercive remedies and that it is not to be interpreted in any narrow or technical sense.

*Id.*

It is not important that the plaintiff seeks a declaration of its *non-liability*. It is not required to act at its peril until the defendant would commence an action charging it with liability. The United States Supreme Court has said as much, as early as 1937. The Court, in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937), ruled that an insurer could be heard where it sought a declaration of non-liability, the issue being the same as if the action had been brought by the insured for a declaration of liability. The Court later did away with any grounds for objection based on the reversed roles of the parties:

> It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). This court thus concludes that declaratory relief befits this action.

## 3. *Other Relief*

■ Finally, from an adjudication of the rights and relationships of the parties to this case, the court is asked to proceed to fashion relief so as to minimize confusion

between plaintiff and defendant. The court finds its authority to do so under 28 U.S.C. § 2202, which has the clear purpose of allowing litigants the opportunity to achieve complete relief, without engaging in multiple litigation. *See, Elkanich v. Alexander,* 315 F.Supp. 659 (D.Kan.1970), affirmed 430 F.2d 1178 (10th Cir. 1970); *A & M Gregos, Inc. v. Robertory,* 384 F.Supp. 187 (E.D.Pa.1974). Furthermore, the court relies on its equitable powers and seeks to balance the equities as they have been found in this case. For if this court does not have the right under these circumstances, where both parties own the name "Pizitz," to balance the equities and condition its decree, then in Dickens' immortal words, "the law is a ass."

### 4. The Doctrine of Secondary Meaning

■ Secondary meaning has been found, as a matter of fact, to have attached to the name "Pizitz" as possessed by both parties. The doctrine of secondary meaning, to preclude the use of a name in question, has very little to do with this case. It is generally attached to a finding of bad faith. *See, e. g., National Distillers Products Corp. v. K. Taylor Distilling Co.,* 31 F.Supp. 611 (E.D.Ky.1940). No finding of bad faith was made here, assuming plaintiff's willing compliance with its promised behavior.

### 5. The Doctrine of Likelihood of Confusion

The doctrine of likelihood of confusion is similarly unimportant to this case, as some degree of confusion has been found to be inescapable. The campaign to distinguish the plaintiff from the defendant, as promised by the plaintiff and ordered by this court, will reduce the confusion to a *de minimis* level as a matter of fact found by the court.

### 6. Good Faith

■ The willingness of plaintiff to dispel confusion and to comply with its promises evinces good faith. *Jefferson Home Furniture Co. v. Jefferson Furniture Co.,* 349 So.2d 5 (Ala.1977). Failure so to comply shall prove plaintiff's bad faith, as a matter of fact found by the court.

### 7. Prohibition of a surname

■ This case is not controlled by the decision of *A. W. Cox Department Store Co. v. Cox's, Inc.,* 221 S.E.2d 539 (W.Va.1976), the only case submitted in which the trial court denied a second-comer the use of its own surname. The *Cox* decision can be distinguished easily on its facts. There, a prior user of the name "Cox" had been established in one locale. A second Cox entered that market from a distant home basis. Here, Pizitz, Inc., seeks to expand its operations without crossing state lines, unlike the *Cox* case. Further, the court notes the great name recognition already enjoyed by Pizitz, Inc., in the Tuscaloosa market, which the second-comer in *Cox* lacked. Moreover, the defendant here primarily has been held out to the public by advertising linking it to Tuscaloosa, such as "Pizitz Tuscaloosa" or "Pizitz of Tuscaloosa; such a geographical distinction was absent in *Cox.* This court concludes that the *Cox* decision represents a minority of one, and its somewhat harsh rule will be disdained.

### 8. Bad Faith

■ Failure of the plaintiff to file with the Clerk its agreement to adhere to its promises as ordered by this court shall conclusively evince its bad faith, the court finds as a matter of fact. On a showing of bad faith the second user is not entitled to the use of its own surname. *N. L. Pierce Nat. Detective Agency v. Pierce Detective Agency,* 217 Ala. 594, 117 So. 191 (1928); *G. B. McVay & Son Seed Co., Inc. v. McVay Seed & Floral Co., Inc.,* 201 Ala. 644, 79 So. 116 (1918); *Paul Sachs Originals Co. v. Sachs,* 325 F.2d 212 (9th Cir. 1963); *Benrose Fabrics Corp. v. Rosenstein,* 183 F.2d 355 (7th Cir. 1950).

Alternative orders are attached hereto as exhibits. Exhibit A shall be entered as the court's final order if plaintiff, within ten days of the entry of these Findings of Fact and Conclusions of Law, shall file its agreement to comply therewith with the court. Otherwise, Exhibit B shall be entered as the

court's final order, plaintiff having conclusively established its bad faith.

## EXHIBIT A

### Proposed Final Order

In conformity with the Findings of Fact and Conclusions of Law entered by the court in this action, the court declares the rights of the parties in accordance with the following:

It is ORDERED, ADJUDGED and DECREED that the plaintiff, Pizitz, Inc., shall be and hereby is allowed to establish a store in Tuscaloosa, Alabama, subject to the following conditions:

(1) That it do so under the name "Pizitz of Birmingham" only.

(2) That, in all public displays of the name "Pizitz of Birmingham," the letter "B" in "Birmingham" be equal in prominence and in size to each of the letters in "Pizitz" other than the "P."

(3) That plaintiff shall not employ the name "Pizitz" in script in a color scheme of either white on black or black on Ben Day in newspaper ads in Tuscaloosa or in publications in neighboring counties other than Jefferson, the defendant having used this color scheme for many years and the plaintiff having used black on white or navy on yellow almost exclusively and having expressed no desire to change.

(4) That the plaintiff shall maintain, as it promised to do, a minimum advertising budget in the first year of its Tuscaloosa operation in accordance with the following guidelines:

(a) Plaintiff shall expend at least $300,000.

(b) Plaintiff shall initiate its campaign at least two months in advance of the opening of the Tuscaloosa store.

(c) The plaintiff shall begin with a direct mail campaign, which shall

(i) be carried to at least 80 percent of locatable households in Tuscaloosa County, which is less than the 40,000 to 50,000 households plaintiff offered to solicit but is in line with the 1970 census figures showing only 38,000 households, and with the practical likelihood of plaintiff's inability to obtain all addresses;

(ii) bear a disclaimer as provided below; and

(iii) include a solicitation for charge account applications, as plaintiff's president offered; plaintiff shall not be required to open all accounts applied for, but only those qualified.

(d) The plaintiff shall then pursue those households that fail to respond to the direct mail with a follow-up telephone campaign, which must

(i) be carried to at least 10,000 homes, though plaintiff's president testified there typically would be 10,000 to 20,000 failures to respond to the direct mail campaign;

(ii) contain the disclaimer as provided below, although the content of the calls may otherwise be determined by the plaintiff; and

(iii) further solicit applications for charge accounts and disclaim connection with defendant's charge accounts, as provided below.

(e) Plaintiff subsequently shall carry out a second direct mail campaign, which shall

(i) employ the same mailing list as the first campaign;

(ii) take place no less than two weeks prior to the opening;

(iii) convey whatever message plaintiff determines but must repeat the disclaimer as provided below; and, in addition

(iv) must include other prominent words stressing who plaintiff is and emphasizing the difference between plaintiff and defendant.

(5) That the plaintiff, in all advertising in Tuscaloosa County, shall disclaim connection with defendant. This disclaimer must comply with the following guidelines:

(i) It shall accompany the first advertising plaintiff shall undertake in Tuscaloosa County and shall continue for at least one year;

(ii) It shall first be submitted to this court for approval as to both terms and application;

(iii) Although the court does not propose to dictate the exact words of the disclaimer, it should convey the message that, "Pizitz of Birmingham is coming to Tuscaloosa in the University Mall. This is not the same company which owns the present three stores in Tuscaloosa." Anything reasonably similar to this statement will suffice;

(iv) It shall be given prominence, and not be buried, in all advertising;

(v) It shall be the first statement in the telephone campaign, and shall say that Pizitz of Birmingham is *coming* to Tuscaloosa and clearly indicate it is not already there;

(vi) It shall accompany, in the telephone campaign, the promised solicitation for credit card applications, which the court and logic suggest could be done by advising those called that defendant's charge accounts are not the same as plaintiff's and that an application for an account with plaintiff is invited; and

(vii) It shall be repeated at the end of the telephone calls.

### EXHIBIT B

#### Proposed Final Order

In conformity with the Findings of Fact and Conclusions of Law entered by the court in this action, plaintiff, Pizitz, Inc., having failed to file with the court within ten days of its entry its agreement to the terms established in Exhibit A thereto, and having thus conclusively established its bad faith in proposing to enter the Tuscaloosa, Alabama, market, the court declares the rights of the parties in accordance with the following:

It is ORDERED, ADJUDGED and DECREED that the plaintiff, Pizitz, Inc., shall be and hereby is ENJOINED and PROHIBITED from establishing a store in Tuscaloosa, Alabama, under any form of the name "Pizitz."