**RAILROAD SALVAGE OF CONN., INC.**

v.

**RAILROAD SALVAGE, INC. and Geraldine Lemme.**

No. 81–0365 S.

United States District Court, D. Rhode Island.

April 11, 1983.

Fish & Richardson by William W. Rymer, John M. Skenyon, Providence, R.I., for plaintiff.

Richard A. Ciccone, Dennis S. Baluch, Providence, R.I., for defendants.

## OPINION

SELYA, District Judge.

The plaintiff, spurred by a desire to salvage the good repute of its corporate name, instituted this action, pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and

under common law trademark and trade name infringement, attempting thereby to punch the defendant's ticket, as it were. The complaint seeks injunctive and ancillary relief only; the plaintiff wants defendant to scrap the use of the name "Railroad Salvage". No claim is made for money damages or loss of profits. The matter is presently before the Court on the plaintiff's motion for summary judgment. Tracking this motion requires that the Court traverse the junkyard[1] of trademark and trade name law. Before essaying this task, however, some description of the litigants and of their relative stations in life appears warranted.[2] All aboard!

## ON THE TRAIN TO SUCCESS

The story of the plaintiff is as American as Casey Jones.[3] Some thirty-five years ago, the plaintiff's founder, Reuben W. Vine, borrowed one hundred dollars and began selling items out of a storefront emblazoned with the appellation "Freight Salvage." In those early years, Vine purchased undeliverable goods from railroads and trucking companies and sold this excess baggage to consumers at fares representing simultaneously a substantial discount to the purchaser and a substantial profit to the vendor. The venture proved sufficiently remunerative that Vine, several years hence but well before the defendant left the depot, rechristened the business "Railroad Salvage" and incorporated it in Connecticut as "Railroad Salvage of Conn., Inc." This took place in 1965; its headquarters was then located in Meriden, Connecticut. Affidavit of Reuben W. Vine ¶¶ 2, 4 (hereinafter "Vine Affidavit").

From these humble beginnings, Vine built up a head of steam and the corporation grew into a multi-million dollar business. As the train of events continued, the company no longer limited itself to purchasing undeliverable goods, but actively sought out merchandise sold in bankruptcy liquidations and discontinued or overstocked merchandise from more conventional sources. In pursuit of appropriate wares, the plaintiff now contacts possible suppliers throughout the United States; in turn, firms will contact the plaintiff when they believe they have merchandise suitable for the plaintiff's distribution requirements. Exhibit B, Vine Affidavit.

Vine has also expanded the retail portion of the business well beyond the storefront. Plaintiff operates a freight warehouse in Connecticut which supplies goods to four company stores (East Windsor, West Haven, and Groton, Connecticut and Turners Falls, Massachusetts). First Affidavit of Donald Roberge, ¶ 4 (hereinafter "Roberge I").

The focal point of this litigation is the Groton emporium, which is conveniently located only a few miles from the Rhode Island state line. To maximize sales and to take advantage of the Rhode Island market, the plaintiff advertises heavily in Rhode Island media.[4] This promotion includes advertisements placed in daily newspapers of essentially statewide circulation within Rhode Island; and also includes the airing of television commercials on local Providence-area television stations, with sometimes exasperating echolalia. Plaintiff's exploitation of both print and electronic media prominently features the name "Railroad Salvage." Roberge I ¶ 5 and Ex-

---

1. Although the term "junkyard" may be somewhat pejorative, it is nonetheless apt. The Ninth Circuit has described this area of the law thusly: "[i]ts hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HHM Publishing Co. v. Brincat,* 504 F.2d 713, 716 (9th Cir.1974).

2. The facts, as set forth *ante,* are in all cases taken from affidavits and the like which, of record, stand uncontradicted before the Court.

3. The storied engineer of the Cannonball Express, Casey gave his life in a calamitous train wreck to save passengers and crew. Had this folk-hero not kept his hand on the brake handle at the cost of his own life, hundreds would have perished.

4. The plaintiff's controller, Donald Roberge, estimates that the bulk of the $390,000 spent on advertising for the Groton store in fiscal year 1980 was tendered in the Rhode Island media. Roberge I ¶ 6.

hibit A attached thereto. This media blitz has generated an impressive track record; sales were recorded of approximately four million dollars for the Groton store in fiscal year 1980. The plaintiff estimates that 40% of its customers at Groton are Rhode Islanders. Roberge I ¶ 7.

## THE OTHER SIDE OF THE TRACKS

Bernard Werther, on the other hand, seemingly wanted to take the short ride down the main line to success. To this end, Werther became an entrepreneur and opened his own business. As compared to the conductor of plaintiff's enterprises, he can only be characterized as a mere trainee. In December of 1980, not more than a few weeks after a story about the plaintiff's swift rise from rags to riches was prominently displayed in the Providence Sunday Journal, Werther (his hopes apparently hoisted by plaintiff's accelerated time-table) incorporated "Railroad Salvage, Inc." in Rhode Island. He was sole shareholder and its general manager.[5] Defendant's Answers to Plaintiff's Interrogatories (hereinafter "Interrogatories"), No. 5. The defendant's original railhead was located at 893 Post Road, Warwick, Rhode Island; later, the defendant chugged along to its present address, 22 Roseland Avenue, Warwick, Rhode Island. Id.

The defendant has three main lines of enterprise. As gauged by the Court, approximately 30%–40% of its business involves the assembling and jobbing of jewelry products. The sale of general merchandise at wholesale to flea market operators accounts for another 20% of the business. The remainder involves acting as a sales agent and wholesaler. As a spur line, the defendant generates approximately 1%–2% of its business from retail sales of pocket

T-shirts and paint.[6] Interrogatories, Nos. 1, 2, 3, 10 and 13.

In contradistinction to the plaintiff, the defendant has done only minimal advertising. The defendant did, however, place an advertisement in "Women's Wear Daily" announcing that it would purchase close-outs. Its other ties to media advertising are scant, and are detailed in discovery. Interrogatories, Nos. 8, 9. Although the record is not a model of clarity, this Court will assume *arguendo* that only the defendant's offer to purchase close-outs prominently displayed the name "Railroad Salvage". Interrogatories, Exhibit A.

The defendant has operated in a much more geographically limited area than does the plaintiff. The defendant has, however, used the name "Railroad Salvage" in business transactions in New York, Rhode Island, New Jersey, California, Massachusetts, Maryland, and Ohio. Interrogatories, No. 17. All of its retail sales took place in Rhode Island; it has not done business in Connecticut. *Id.; see also* Interrogatories, No. 2.

## A DOWN–THE–LINE SYNOPSIS

The plaintiff is a large, successful retailer which has ridden the monorail to prosperity. Its tracks are found throughout the United States. It is apparently well-known by companies desiring to liquidate inventories of goods not merchantable in more commonplace ways. While plaintiff does not conduct a retail business within Rhode Island, it has received extensive exposure therein and does a significant amount of traffic with Rhode Islanders.

In the jargon of the switchyard, the plaintiff is a locomotive, while the defendant is a dolley. The defendant's business

---

**5.** All other corporate offices were held by Geraldine Lemme. While she is named as a defendant, the plaintiff seeks only injunctive relief against her. Plaintiff's Brief at 6 n. 5. Thus, references to the "defendant" in this opinion refer only to Railroad Salvage, Inc. unless the lay of the tracks clearly signals otherwise.

**6.** This sideline is not economically significant: pocket T-shirts accounted for $1,800 in annual sales and paint accounted for $2,000 in annual sales. Interrogatories, No. 1. While the record is less than precise as to the total volume of business transacted during the defendant's first year of operations, it is plain that sales were no less than $380,000 and no greater than $760,-000.

appears to be moderately successful; it has some interstate contact. Given the paucity of the defendant's advertising budget and the narrow gauge of its endeavors, it seems inevitable that the general commercial and consumer public is far more aware of the plaintiff than of the defendant.

## CLEARING THE TRACKS: THE SUMMARY JUDGMENT STANDARD

The plaintiff, having obtained relief *pendente lite*,[7] has now moved for plenary summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff has filed a statement of undisputed facts, a memorandum of law in support of its motion for terminal relief, and has tendered several supporting affidavits (which, together with the discovery of record, comprises the platform upon which the motion is predicated). In its motion, the plaintiff seeks to make the injunction permanent and to secure an award of costs and attorneys' fees. The defendant has objected and has filed a brief.[8]

It is well settled that summary judgment can be engineered only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, at 986 (1st Cir.1983); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425

U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *United Nuclear Corp. v. Cannon,* 553 F.Supp. 1220, 1226 (D.R.I.1982); *Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288, 1292 (D.R.I.1982). In short, relief under Rule 56 is available only if the movant has demonstrated that the tracks are clear and that they run only in one direction. In determining whether such a trunk line to *brevis* disposition exists, this Court must view the record in the light most favorable to the party opposing the motion, *Emery v. Merrimack Valley Wood Products, Inc.,* at 986; *John Sanderson & Co. (WOOL) Pty. Ltd. v. Ludlow Jute Co.,* 569 F.2d 696, 698 (1st Cir.1978), indulging all inferences favorable to that party. *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir.1982); *O'Neill v. Dell Publishing Corp.,* 630 F.2d 685, 686 (1st Cir.1980). After a careful review of the record, the Court is persuaded that this is a case where the switch should be thrown and the summary judgment engine activated.

## WHAT'S IN A NAME?

The plaintiff alleges that the defendant's utilization of the words "Railroad Salvage" infringes upon the service mark and trade name used by the plaintiff.[9] A trade name describes the manufacturer or dealer, and applies not to vendible goods

---

**7.** On July 7, 1981, the whistle was blown, and a preliminary injunction was issued by the Court restraining the defendant from doing business under the trade name "Railroad Salvage".

**8.** The defendant did not file counter-affidavits as suggested by Fed.R.Civ.P. 56(e). It appears to be relying on the answers to interrogatories to establish the existence of a genuine issue of material fact. *See, e.g. Simmons v. Union News Co.,* 341 F.2d 531, 533 (6th Cir.),* *United States v. Kansas Gas & Elec. Co.,* 287 F.2d 601, 603 (10th Cir.1961); *Young v. South Side Packing Co.,* 369 F.Supp. 59, 60 (E.D.Wis.1973); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2738, at 465–67 (1983). Defendant also filed a counter-statement of material facts, *see* Local Rule 12.-1(a)(2), which has been duly considered. The defendant did not, however, request oral argument pursuant to Local Rule 12.1(b). In the absence of such a request, the Court has exercised its discretion in determining that such a presentation would be superfluous. *Cf. United*

*States v. One 1974 Porsche 911–S,* 682 F.2d 283, 286–87 (1st Cir.1982).

* *Cert. denied,* 382 U.S. 884, 86 S.Ct. 165, 15 L.Ed.2d 125 (1965).

**9.** The Lanham Act draws a distinction between trade names and service marks. Under the Act, service marks are registrable while trade names are not. 15 U.S.C. § 1127; 1 J. McCarthy, *Trademarks and Unfair Competition,* § 9.6, at 257–58 (1973). The plaintiff, not having registered the words "Railroad Salvage" with the United States Patent and Trademark Office, acquires no benefit from this Court's alternative characterization of "Railroad Salvage" as a service mark or trade name. *See* text *infra.* Having recognized the technical distinction, the Court will lapse into what has come to be the accepted judicial vernacular and will employ the designations service mark (or mark) and trade name (or name) interchangeably. *Walt-West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1054 n. 6 (7th Cir.1982).

but to the business and its goodwill. *New West Corp. v. NYM Co.,* 595 F.2d 1194, 1201 (9th Cir.1979); *American Optical Corp. v. North American Optical Corp.,* 489 F.Supp. 443, 447 (N.D.N.Y.1979); *Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.,* 371 F.Supp. 900, 907 (W.D.Ark.1974). Although trade names are not registrable under the Lanham Act, *see* note 9 *supra,* they are nonetheless protected under the Act. Section 43(a) of the Act, 15 U.S.C. § 1125(a), provides:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

This provision has authoritatively been interpreted as creating a right to maintain an action for trade name infringement. *Walt-West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1054 n. 6 (7th Cir.1982); *Finance Co. of America v. Bankamerica Corp.,* 493 F.Supp. 895, 903 (D.Md.1980); *American Optical Corp. v. North American Optical Corp.,* 489 F.Supp. at 450; *Pizitz, Inc. v. Pizitz Mercantile Co.,* 467 F.Supp. 1089, 1095 (N.D.Ala.1979); *Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261, 267 (S.D.N.Y.1968); *see Metric & Multistandard Components Corp. v. Metric's Inc.,* 635 F.2d 710, 713–14 (8th Cir.1980); *New West Corp. v. NYM Co.,* 595 F.2d at 1201. Under this statute, trade name infringement occurs when the unsanctioned use of one's distinctive name in interstate commerce by another will create a probability of confoundment or deception as to the source of the goods or service. *See, e.g., Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833 (6th Cir.1983); *New West Corp. v. NYM Co.,* 595 F.2d at 1201; *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 160 (1st Cir. 1977); *National Lampoon, Inc. v. American Broadcasting Cos.,* 376 F.Supp. 733, 746 (S.D.N.Y.), *aff'd per curiam,* 497 F.2d 1343 (2d Cir.1974). This definition implicitly requires the plaintiff to prove the following three elements to succeed in an infringement suit: (i) the ownership of a distinctive name; (ii) the use of that name in interstate commerce; and (iii) its use by another in a manner likely to cause confusion as to the origin of the goods or services. In applying this tripartite test to the facts at bar, plaintiff's prior ownership and use of its name is undisputed; but the defendant claims that plaintiff's case goes up in smoke because that name does not qualify as distinctive. Perscrutation is, therefore, requisite to see how that line of defense fares.

## EN ROUTE TO PROTECTION: FOUR WAY STATIONS

■ Trade names are divided into four categories which, in scandent order of the protection afforded, may be labelled (i) generic; (ii) descriptive; (iii) suggestive; and (iv) arbitrary and fanciful. *S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir.1979).

Generic names are those which refer to the basic nature of the wares or services provided rather than to the more idiosyncratic characteristics of a particular product. *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 11 (5th Cir.1974); *see, e.g., Miller Brewing Co. v. Falstaff Brewing Corp.,* 655 F.2d 5, 7 (1st Cir.1981); *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir.1975). Thus, courts have

categorized terms such as "mart", *S.S. Kresge Co. v. United Factory Outlet, Inc.,* 634 F.2d 1, 2 (1st Cir.1980), "multistate bar examination", *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 487–88 (7th Cir.1982), and "cola", *Coca-Cola Co. v. Snow Crest Beverages, Inc.,* 162 F.2d 280, 283 (1st Cir.), *cert. denied,* 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947), as generic because each does no more than describe a class of product or service without distinguishing the source or origin. Such marks are not protectable. *See, e.g., Kresge, National Conference,* and *Coca-Cola Co.,* all *supra.*

A descriptive term is one which portrays a characteristic of the article or service to which it refers. *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 374 n. 8 (1st Cir. 1980). Under this paradigm, a name must clearly denote what goods or services are provided in such a way that the consumer does not have to exercise powers of perception or imagination. *Purolator, Inc. v. EFRA Distributors,* 524 F.Supp. 471, 477 (D.P.R.1981), *aff'd* 687 F.2d 554 (1st Cir. 1982); 1 J. McCarthy, *Trademarks and Unfair Competition* § 11:18, at 382 (1973). Examples of descriptive marks would include the "Vision Center" in reference to a place where one purchases eyeglasses, *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 117 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980), "EVERREADY" with reference to batteries or light bulbs, *Union Carbide Corp. v. Ever-ready, Inc.,* 531 F.2d 366, 380–81 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976), or "HOTRAY" in reference to electric food warmers. *Salton, Inc. v. Cornwall Corp.,* 477 F.Supp. 975, 986–87 (D.N.J.1979). These terms are entitled to protection of the Lanham Act only if they have acquired a secondary meaning. *Purolator, Inc. v. EFRA Distributors,* 687 F.2d at 562; *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d at 374 n. 8; *Valmor Products Corp. v. Standard Products Corp.,* 464 F.2d 200, 202 (1st Cir.1972).

The next whistle-stop on this funicular is the category of suggestive terms. These connote, rather than describe, some particular product(s) or service(s); it requires use of the consumer's ingenuity to envisage the nature of the product or service. Courts have classified the following names as suggestive: "ULTRASUEDE" when used in describing suede-like fabrics, *Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1129–30 (2d Cir.1982); "NATIVE TAN" when referring to a suntan lotion, *Sun-Fun Products, Inc. v. Suntan Research & Development Inc.,* 656 F.2d 186, 191 n. 5 (5th Cir.1981); and "BEETLE" when used in describing a plastic fishing lure, *Bass Buster, Inc. v. Gapen Manufacturing Co.,* 420 F.Supp. 144, 157–58 (W.D.Mo.1976). Such terms need not have acquired secondary meaning to be eligible for protection. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 791 (5th Cir.1983); *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d at 374 n. 8. The line between descriptive and suggestive terms is often blurred, and the categorization of a name as "descriptive" or "suggestive" cannot be divined by the application of any hard and fast rules, but must be decided on a case-by-case basis. *See* 1 J. McCarthy, *Trademarks and Unfair Competition,* § 11:23, at 395.

The last remaining grouping—arbitrary or fanciful terms—need not be discussed at length here, as plaintiff has conceded that there is a nexus between the name in question in this case and the service provided. Plaintiff's Brief at 1–2. Once such a junction exists, pigeon-holing of a name as either arbitrary or fanciful is sidetracked. *Cf. AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349–50 (9th Cir.1979); *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 155–56 (S.D.N.Y.1980). In any event, given the facts as elucidated above, the Court would so find as a matter of law. *See Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d at 374 n. 8.

■ With these principles in mind, this Court now must decide whether the trade name and service mark "Railroad Salvage" is generic, suggestive or descriptive. The word "railroad", standing alone, is defined as a "permanent road having a line of rails

fixed to ties on a level or graded roadbed and providing a track for . . . cars." Webster's Third New International Dictionary 1876 (1981).[10] "Salvage" is defined as "something extracted (as from wreckage, ruins, or rubbish) as valuable or having further usefulness." *Id.* at 2006.

The plain meaning of these words, when coupled, does not denote basic services provided by the plaintiff, nor do they accurately describe such services without resort to the use of some ratiocination by the consumer. Although the name depicts, in a general manner, the source of some of the goods sold by the plaintiff, it does not fully or precisely limn the services provided by the plaintiff. *See, e.g., Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 687 F.2d 563, 566–67 (2d Cir.1982). The plaintiff does not extract usable goods from railroads; rather, it purveys wares which could not be sold through traditional channels (only a portion of which could, even with the greatest of liberties, be described as "salvage").

**10.** It is true, of course, that the word has acquired a second meaning when used as a verb, being roughly equated with accomplishing a goal (often a nefarious one) with undue haste and without the benefit of adequate consideration or evidence; while of passing semantic interest, perhaps, it is clear to the Court that the trade name in question prescinds solely from the accepted usage of the word as a noun, with the meaning ascribed *ante.*

**11.** Even if proof of secondary meaning were required, the Court is of the opinion that this plaintiff would be entitled to relief because the term "Railroad Salvage" has, by plaintiff's activities, acquired a secondary meaning.
Secondary meaning is the bridge comprising the consumer's association between the trade name and the singular provider of the product or service. *See, e.g., President & Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d 804, 807 (1st Cir.1975); *Puritan Furniture Corp. v. Comarc, Inc.,* 519 F.Supp. 56, 59 (D.N.H.1981). Divers considerations may be relevant in signaling the existence of secondary meaning, e.g.: (i) long and exclusive use; (ii) size and-or prominence of an enterprise, and its success; and (iii) extensive promotion. *President & Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d at 807–08. Upon consideration of these and kindred factors, this plaintiff has built up a formidable head of entrepreneurial steam, and has

The Court believes that the nomenclature here at issue necessitates some use of the consumer's imagination in order to determine the nature of the plaintiff's services, and is distinctive. Consequently, the appellation is entitled to trade name protection, as a suggestive name or mark, without proof of secondary meaning. *Id.; Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d at 374 n. 8.[11]

## THE RAILBED OF INTERSTATE COMMERCE

■ This stated, the journey now approaches the next crossing. The plaintiff, having established the distinctiveness of its name, must prove that the defendant caused goods or services bearing the name or some facsimile thereof to enter into the stream of interstate commerce. This burden can be met by showing an adverse effect on the sales or goodwill of one whose trade name or mark is used in interstate commerce, even if the defendant's activities are wholly intrastate.[12] *Purolator, Inc. v.*

plainly established the existence of a secondary meaning. The plaintiff's assertion that it has used the name "Railroad Salvage" for many years, Vine Affidavit ¶ 1, is undisputed, as is the fact that such use long pre-dates the defendant's initial attempt to board the gravy train. Plaintiff's stature in the marketplace and its prominence in the purchase and sale of surplus and special-situation merchandise is likewise uncontroverted. Vine Affidavit, Exhibit B. The plaintiff has been demonstrably successful in its endeavors. *Id.* Finally, plaintiff has expended (and continues to expend) substantial sums of money on advertising (such that plaintiff's founder has become something of a regional celebrity). Vine Affidavit, Exhibit A; Roberge Affidavit ¶ 6. Collectively, these factors withstand the searchlight of defendant's scrutiny, and document the existence of secondary meaning beyond peradventure of doubt. This, in turn, entitles the plaintiff to the safe passage of the Lanham Act.

**12.** The defendant, in its brief, urges that the Court be guided by a set of artificial territorial limits, urging in effect that so long as the businesses are located in different cities, or at most, different states, there should be a mandatory finding of the absence of competitive effect. Defendant's Brief at 4, citing, *e.g., Nisley Shoe Co. v. Nisley Co.,* 72 F.2d 118 (6th Cir.1934). This argument is so spurious as to be deserving

*EFRA Distributors, Inc.,* 687 F.2d at 559; *see, e.g., Coca-Cola Co. v. Stewart,* 621 F.2d 287, 290–91 (8th Cir.1980); *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 120 (9th Cir.), *cert. denied,* 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); *Kampgrounds of America, Inc. v. North Delaware A–OK Campground, Inc.,* 415 F.Supp. 1288, 1290–91 (D.Del.1976), *aff'd mem.,* 556 F.2d 566 (3rd Cir.1977); *Burger King of Florida, Inc. v. Brewer,* 244 F.Supp. 293, 297–98 (W.D.Tenn.1965). There is massive uncontroverted evidence here that the plaintiff has made abundant use of its name in interstate commerce. It has stores in two states. It spends significant sums of money advertising in Rhode Island to bring customers through the turnstiles by the trainload. It operates a fleet of trucks which transport goods throughout the United States. In addition, the plaintiff contacts possible suppliers nation-wide. In support of these functions, the plaintiff maintains an office in Omaha, Nebraska. The defendant rails against the plaintiff's thrust for protection, but does not deny that it seeks, to some extent, the same suppliers and types of goods which the plaintiff covets. The possible diversion of goods to the defendant, standing alone, has a potential braking effect which clearly meets the benchmark of adverse impact in interstate commerce. It is an inescapable inference from the evidence that the continued actions of the defendant in preying upon plaintiff's name denigrate the plaintiff's goodwill. The record illustrates, for example, that merchandise intended for the defendant has been shipped to the plaintiff—and that the plaintiff has been dunned for payment. The potential damage to the relationship built up between the plaintiff and its suppliers and to plaintiff's hard-earned credit standing is self-evident. Thus, this Court finds sufficient uncontradicted evidence to traverse the second spur of the infringement test.

### THE MERCHANT'S LIMITED

While businessmen are not free blithely to consign another's suggestive trade name to their endeavors, mere use will not *per se* warrant judicial intervention. *Cf. Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 500–02, 505 (5th Cir.), *cert. denied,* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979); *Allen Homes, Inc. v. Weersing,* 510 F.2d 360, 361 (8th Cir.), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975).

If it is not to be flagged down in its summary judgment excursion, the plaintiff must also show that defendant's use of the phrase "Railroad Salvage" is likely to cause confusion. In assessing whether or not the plaintiff has rolled past this track marker, the Court has considered the following factors: (i) the similarity of the marks; (ii) the similarity of the goods or services; (iii) the relationship between the parties' channels of trade; (iv) the relationship between the parties' advertising; (v) the classes of prospective purchasers or suppliers; (vi) the evidence of actual confusion; (vii) the defendant's intent in adopting its mark; (viii) the potency of the plaintiff's mark; and (ix) the strength of the defendant's mark. *Pignons S.A. deMecanique v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981); *accord Leathersmith of London, Ltd. v. Alleyn,* 695 F.2d 27, 29–30 (1st Cir.1982); *Amstar Corp.*

---

of the same characterization accorded by this Court to an eleventh hour constitutional challenge derailed in *Beberian v. National Railroad Passenger Corporation,* 550 F.Supp. 592 (D.R.I. 1982): "It is, as it were, the caboose bringing up the rear of [the defendant's] train of thought". *Id.* at 595. Neither plaintiff's broad business endeavors nor defendant's newly-emergent venture are comparable in any relevant aspect to the neighborhood bootery strapped figuratively to the tracks in *Nisely.* The courts are consentient in holding that state lines do not define commercial markets because neither the reach of advertising, nor the peregrinations of the consumer public, nor the service areas of suppliers, nor secondary meaning itself, are fenced in by political boundaries. *Food Fair Stores, Inc. v. Square Deal Market Co.,* 206 F.2d 482, 485 (D.C.Cir.1953), *cert. denied,* 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 426 (1954); 2 J. McCarthy, *Trademarks and Unfair Competition* § 26: 12 at 224; *see Huber Baking Co. v. Stroehmann Bros. Co.,* 252 F.2d 945, 955 (2d Cir.1958).

*v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980). Let us now proceed to track these factors.

The marks are, to all intents and purposes, identical in spelling and in pronunciation.[13] This synonymity is not necessarily issue-determinative; the presentation of the name or mark may be such as to eliminate possible confusion. *Pignons S.A. deMecanique v. Polaroid Corp.*, 657 F.2d 487. There is, however, no evidence in this case that the names used by these parties are presented to either purchasers or suppliers in a manner which would serve to reduce the possibility of confusion.

Both the plaintiff and defendant deal, at least in part, in merchandise which went unclaimed through the milk run of more stereotypical wholesale and retail channels. The plaintiff maintains a constant look-out for potential caches of unsold merchandise. The defendant has taken at least one roundhouse swing at this market by placing an advertisement (in "Women's Wear Daily") soliciting unsold women's clothing. Although the plaintiff does not cater to flea marketeers (as does the defendant), the plaintiff's merchandise and prices could very well be attractive to those customers. Thus, the essential service provided both by the plaintiff and by the defendant—acting as "middlemen" of surplus merchandise—is similar. And, even though clientele of the plaintiff and of the defendant are somewhat different, the parties' sources of supply tend to be the same. The record is replete with examples such as the defendant's purchases of ladies jackets, watches and the like under circumstances falling squarely within the plaintiff's wonted *modus operandi*. This Court finds that the channels of trade and advertising for the

parties are sufficiently similar so as to require an inference of probable confusion.

The strongest evidence of a likelihood of confusion is, of course, a showing of actual confusion. While one misdirected order for a camera may be weak evidence on this issue, *Pignons S.A. deMecanique v. Polaroid Corp.*, 657 F.2d at 490, the proof of confusion in the instant case has much more locomotive force. Within the first two months of the time when defendant fired up its engine, the plaintiff received a freight invoice for goods trans-shipped to the defendant. Roberge Affidavit ¶ 8 and Exhibit B attached thereto. Again, in March of 1981, the plaintiff was the recipient of a freight invoice for goods delivered to the defendant. This evidence is especially potent, as vendors are, on the whole, far better trained than the general public to differentiate between commercial entities. The Court finds these incidents to be persuasive of the existence of actual confusion on the part of suppliers.

The defendant's intent in adopting the name "Railroad Salvage" also is suspect. Hijacking aside, there is no readily apparent tie between the defendant's business activities and the name conferred upon it by its founder. While the defendant asseverates that it was wholly unfamiliar with the plaintiff prior to the institution of this litigation, Interrogatories, No. 14, this Court is not blind to the fact that the defendant was dispatched into the world of commerce under its present corporate name approximately one month after a success story of the Horatio Alger genre appeared in the "Providence Sunday Journal" detailing the heroics and the attainments of Vine and of the plaintiff. The disingenuous allegation that defendant had never heard of the plaintiff is, even on a motion for summary judgment, insufficient to rebut the presumption that a junior user borrowing the name of a senior user intends to switch mercantile loyalties by creating confusion in

---

13. Although the defendant contends that its name is different from the corporate name of the plaintiff, there is no dispute that the plaintiff only uses the words "Railroad Salvage" in its advertising. *See* Roberge I, Exhibit A. To the extent that there is a difference in onomastics, it is a difference without a distinction as regards this action.

the marketplace.[14]  *See Chart House, Inc. v. Bornstein,* 636 F.2d 9, 10 (1st Cir.1980).

To drive the final spike, there can be, on this record, little or no dispute as to the strength of the plaintiff's mark; nor any room for legitimate doubt that defendant's mark, as applied exclusively to its enterprises, is anything but frail.

In sum, the plaintiff has amply demonstrated that there is a clear and present likelihood of confusion created by defendant's use of the plaintiff's name and mark.

## THE END OF THE LINE

The plaintiff's express has run precisely on schedule, and has successfully traversed each grade, bridge and tunnel en route to summary redress.  The Court is satisfied that, on the instant record, there is no genuine issue as to any material fact; and that the plaintiff is entitled to judgment as a matter of law.  The corporate defendant should not be permitted to continue or to resume business operations under the offending title; its corporate name must, for purposes of commerce, be consigned to the scrap heap.  The "Railroad Salvage" stops here!

Accordingly, the Court will grant a permanent injunction as prayed for against both defendants and will assess court costs and attorney's fees [15] against the corporate defendant.[16]  Counsel for the plaintiff are directed to present a form of order to the Court for entry consonant with the topography of this opinion.  Plaintiff shall thereafter, within ten days next following the entry of such order, submit its application for counsel fees and disbursements, and the defendant shall file its assent or opposition thereto (as the case may be) within ten days next following.[17]

---

14.  This is particularly so in this case, where there are no affidavits filed in opposition to the motion, and where there is no proffered explanation either of a cogent rationale or a discernible right-of-way for the defendant's choice of its name.  The plausibility of sheer coincidence cannot be swallowed whole; if raillery might be permitted, a willingness to ingest such an argument would require chug-a-lugging to a degree which far exceeds either this Court's capacity or its fatuousness.

15.  15 U.S.C. § 1117;  *see RCA Records, Inc. v. Kory Records, Inc.,* 197 U.S.P.Q. 908 (S.D.N.Y. 1978).

16.  Counsel fees have been waived by the plaintiff as to the individual defendant.  *See note 5, supra.*

17.  With apologies to Watty Piper, this is the end of the line for the little engine that couldn't.  *Cf.* Piper, *The Little Engine That Could,* The Book House for Children (1951).  While Werther, having spied an opportunity, may well have whispered "I think I can", this Court thinks he cannot.