73 F.Supp.2d 106 (1999)
CCBN.COM, INC., Plaintiff,
v.
C-CALL.COM, INC., Defendant.
No. Civ.A. 99-11604-PBS.
United States District Court, D. Massachusetts.
November 18, 1999.
*107 Steven W. Phillips, Michael Boudett, Alix Biel, Foley, Hoag & Eliot, Boston, MA, Michael A. Albert, Foley, Hoag & Eliot, Boston, MA, for CCBN.Com, Inc., plaintiff.
William R. Grimm, Timothy J. Perry, Hinckley, Allen & Snyder, Boston, MA, Michael J. Connolly, Hinckley, Allen & Snyder, Boston, MA, Carla B. Oakley, Brobeck Phleger & Harrison, LLP, San Francisco, CA, for C-Call.Com, INC., defendant.
A. David Mazzone, United States District Court, Boston, MA, for A. David Mazzone, ADR Provider.

MEMORANDUM AND ORDER
SARIS, District Judge.

INTRODUCTION
This is a dispute over an Internet domain name and service mark between two competing companies that provide on-line stock market information and financial services to investment professionals. In this essentially two player market, these firms compete web page-to-web page. Plaintiff CCBN.com, Inc. ("CCBN"), which uses the service mark StreetEvents.com, has moved for a preliminary injunction to prevent the defendant, c-call.com ("c-call") from using the service mark StreetFusion.com, alleging that the similarity between the two marks has caused consumer confusion in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and state law.[1] It also claims that c-call's pronouncement in its web page that it is the "first and only Internet-based information exchange for the financial community," is a false and misleading description of fact in violation of 15 U.S.C. § 1125(a)(1).
Defendant argues that plaintiff is not the senior user of the mark and there is no likelihood of consumer confusion. It points out that the purchasers of the systems are highly sophisticated investment professionals; the difference in price is dramatic, ($400,000 for c-call vs. free for CCBN); and plaintiff is providing only a trial product, rather than a final version. Defendant also points out that it has withdrawn the allegedly misleading statement on the web page. After hearing, while it is a close call for c-call, the Court DENIES plaintiff's motion.

I. FACTS

A. StreetEvents.Com

StreetEvents.com is an Internet-based service targeted at investment professionals such as portfolio managers, industry analysts, and research assistants. The staff at CCBN gathers information from investor relations departments of publicly traded companies, and then organizes and posts this information on the StreetEvents.com web site. Subscribers who log into the site with an identification and password can gain access to schedules of earnings events, and conference calls for several publicly traded companies. StreetEvents.com also offers an e-mail service which alerts subscribers daily to relevant stock market information. Finally, StreetEvents.com offers audio archives of conference calls of many large, publicly traded companies.
StreetEvents.com's services are currently provided at no charge to subscribers. CCBN intends to start charging for the service after the end of 1999.
CCBN began preparing a business plan and brand testing the use of StreetEvents.com *108 as early as October of 1998. The mark is also a domain name that identifies the Internet address on the world wide web. It has used the mark StreetEvents.com on its web page since January of 1999, when it began providing its earning events calendaring service to certain subscribers with a "beta" (or trial) version of the StreetEvents.com web site. There are no records documenting the identity or number of subscribers allowed access to the site in early 1999. Third party access for subscribers was based on personal contacts of Kishore Rao, the general manager.
The service was promoted at a trade fair in February, 1999 where postcards and brochures were distributed. The first advertising was published in May, 1999. CCBN applied for a service mark registration for the StreetEvents.com mark on June 22, 1999.
Currently over 500 subscribers use the StreetEvents.Com site every day (free of charge) and more than 1,000 investment professionals are on its e-mail list.

B. StreetFusion.com

Defendant c-call, through its previous web site and now through StreetFusion.com, offers similar stock market information about publicly traded companies over the Internet to similar types of investment professionals. Specifically, c-call provides earnings events information, earnings projections, analyst calls, and broadcasts of conference calls to investment professionals. Conference calls are broadcast live on StreetFusion.com, while they are currently available in audio archive through StreetEvents.com. C-call also provides an e-mail service to inform its subscribers about changes to conference call schedules or earnings release schedules. C-call charges up to $400,000 for a one-year subscription for its services. Its customers include: (1) directors or managers of investor relations for public companies who are responsible for disseminating the company's earnings releases and press releases, and disseminating information about analyst conference calls for their companies; (2) independent investor relations firms, which provide basically the same service for public companies as in-house directors or managers of investor relations; (3) portfolio managers or directors of investment research for buyside firms, such as Fidelity or T. Rowe Price, who are money managers or fund managers; and (4) directors of research or analysts for sell-side firms, such as Bear Stearns or Morgan Stanley, who evaluate stock performance, recommend stocks to buy or sell, and affect actual trades of public stocks.
C-call launched its original web site, under the domain name c-call.com, in November of 1998. In February 1999, c-call engaged the services of a branding and design firm to help create a new name and identifying logo. It was dissatisfied with its c-call.com domain name because it was providing more expanded services than simply access to conference calls. C-call selected StreetFusion.com as its new service mark. On April 2, 1999, it reserved the domain name StreetFusion.com. On April 7, 1999 after intellectual property counsel conducted a preliminary trademark search, which turned up no conflicting marks, c-call filed an application to federally register the StreetFusion.com mark. According to Todd Walker, the cofounder and president of c-call.com, defendant officially rolled out its service under the StreetFusion mark in mid-April 1999. It had a website operating at its StreetFusion.com address by mid-to-late April. By late April, the web site was fully operational. In its press release dated May 1, 1999, defendant announced the launch of StreetFusion.com. The company claims it chose StreetFusion to convey the goal of "fusing" technology and information, and of "fusing" customers who were previously unconnected.
Shortly after c-call changed its name to StreetFusion.com, plaintiff states it began experiencing customer confusion.

*109 II. DISCUSSION

A. Preliminary Injunction Standard

Plaintiff, as the moving party seeking a preliminary injunction, must meet four criteria before an injunction can issue. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. See TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir.1996). Plaintiff bears the burden of making each of these showings. See International Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc., 826 F.2d 1141, 1144-45 (1st Cir.1987) (citing Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981)). In the context of the Lanham Act, "there is considerable authority for the view that the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on the plaintiff's reputation." Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 14 (1st Cir.1986) ("Camel Hair").
"In a trademark case, the key issue is the likelihood of success on the merits because the other decisions will likely flow from that ruling." Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir.1989); see also Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir.1995) ("The central issue ... with most preliminary injunction trademark cases ... is whether plaintiff demonstrated a likelihood of success on the merits.")

B. Likelihood of Success on the Merits

To succeed in its action under 15 U.S.C. § 1125(a)[2], plaintiff must prove: "1) that [it] uses, and thereby `owns' a mark; 2) that the defendant is using that same or a similar mark; 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." Star Financial Services, Inc. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir.1996) ("Star Financial"). The third factor, likelihood of confusion, is often the dispositive one. See International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 200 (1st Cir.1996) ("Winship Green").

1. Priority of Ownership of the Mark

Plaintiff asserts that it owns senior rights to the StreetEvents.com mark, since it had been using the mark in connection with its service for "several months" before Defendant adopted the StreetFusion.com mark. Defendant argues that plaintiff's use of the StreetEvents.com mark prior to April of 1999 was done only in promotional activities and other preliminary steps toward starting a business, and that these activities are insufficient to establish priority over use of the mark.
The Lanham Act grants trademark protection for marks that are "used in commerce." 15 U.S.C. § 1051. "[A] mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce ..." 15 U.S.C. § 1127. The Supreme Court long ago stated, "the right *110 to a particular mark grows out of its use, not its mere adoption ..." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 50-51, 63 L.Ed. 141 (1918). In the emerging world of the Internet, one court defined "use in commerce" to include establishing a "typical home page on the Internet, for access to all users." See Planned Parenthood Fed'n of America, Inc. v. Bucci, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997).
Advertising and promotional activities, standing alone, have been held to be insufficient to constitute "use in commerce" when not accompanied by the rendering of services. See Buti v. Perosa, 139 F.3d 98, 105 (2nd Cir.1998) (holding that promotional activities insufficient to establish use of mark where defendant never rendered restaurant services in the United States). A party can establish "use in commerce" by demonstrating "test-market use" of the mark preparatory to the provision of services. See Future Domain Corp. v. Trantor Sys. Ltd., 27 U.S.P.Q.2d 1289, 1293, 1993 WL 270522 (N.D.Cal. 1993) (citing E.I. Du Pont De Nemours and Co. v. G.C. Murphy Co., 199 U.S.P.Q. 807, 812, 1978 WL 21268 (1978)) ("Future Domain"). In Future Domain, the court determined that a party's distribution of two hundred free beta versions of its software product at a trade show was not test-marketing sufficient to constitute "use in commerce" because test-marketing involves "offering the product for sale through normal channels of trade in limited markets for limited times." Id. Other courts have found "use in commerce" in the absence of actual sales; however, such pre-sales marketing must be sufficiently extensive. See New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1200 (9th Cir.1979) (finding that the taking of substantial pre-sales subscriptions for a magazine order and extensive advertising was sufficient to establish use in determining ownership of mark). The First Circuit has set forth a two part test to determine whether a party has established "prior use" of a mark in the absence of actual sales:
[E]vidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales.
New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir.1951).
CCBN claims that it is the senior owner of the StreetEvents.com mark by having "rendered services" under that mark beginning in January 1999; attending a February 1999 conference to promote its service under that mark; and marketing its services through mailings and telemarketing.
The testimony of Kishore Rao, the cofounder and general manager of StreetEvents.com, provides the following information. The StreetEvents trademark has been in use since October 1998 when plaintiff registered the web site domain under that name. At that time there was no service or product in existence. The web site was not fully functional. In late October, Rao became the first telemarketer. Through phone inquiries and in-person meetings, without the aid of a consultant, he tested the brand name on potential users. More telemarketers were hired in December. There were no clients or customers until late January, 1999, when plaintiff offered a calendar of investment events available via the World Wide Web that could be personalized based on the user's investment profile. This calendar enabled investor relations professionals to reach an audience of users. Asserting a (dubious) trade secret privilege, Rao refused to state how many events were listed in January, 1999.
The web page does not provide access to all users. In January, Rao hand-picked third parties based on personal contacts who would be permitted access to the site in order to solicit feedback. Rao could not *111 estimate the number of third parties provided such access in January. He could not produce any records or make an estimate concerning the number of users through April, 1999. In February, plaintiff distributed some postcards and brochures at the Robertson & Stephens conference where it had a booth. The first newspaper coverage of plaintiff was in April, but there is no public coverage of the mark until June. There was a mailing to investment professionals in February and March, but no evidence as to how many times. In May, 1999 StreetEvents first placed advertisements for publication. In an online newsletter, "IR Online", dated May 27, 1999, plaintiff first introduced its readers to StreetEvents.com, stating "StreetEvents' Web Site Went Live in April." E-mail services were offered in May, 1999.
At his deposition, Rao refused to provide any information about how much money StreetEvents.com spent in connection with promotional materials or advertising in early 1999, once again asserting that this information was somehow a proprietary trade secret. There is no information in the record as to how much was spent on advertising, how many brochures were mailed, or how extensive the public contact was at the February, 1999 conference.
Because of the gaping holes in the record with respect to numbers of customers and amount of promotional and advertising activities in the early part of 1999, plaintiff has not established that it began to offer services in commerce under the mark StreetEvents.com until April, 1999 at the earliest. Defendant claims it began to offer its services under its StreetFusion.com mark in mid-to-late April, 1999. However, its own press release announces a May launch date. The record is unclear as to which company actively began providing services in commerce under the disputed marks first.
Even in the absence of establishing priority in actual sales, plaintiff may nonetheless prevail if it establishes sufficient test-marketing. The key question for determining ownership of the mark is whether test-marketing the beta version[3] of StreetEvents.com to a limited group of subscribers hand-picked by the founders free of charge, together with the other limited marketing activities prior to April, 1999, is sufficiently public to identify the marked service in the relevant segment of the investment community as services of CCBN. Because of the dearth of information on the extent of test-marketing in the early months of 1999, plaintiff has not established a likelihood of success on priority even under a test-marketing theory. However, because the question of how much test-marketing is enough to establish priority is close, I move on to consumer confusion.

2. Likelihood of Confusion

This Court considers eight factors in assessing likelihood of confusion in the trademark context: 1) the similarity of the marks; 2) the similarity of the goods (or, in the case of a service mark action, similarity of the services); 3) the relationship between the parties' channels of trade; 4) the relationship between the parties' advertising; 5) the classes of prospective purchasers; 6) the evidence of actual confusion; 7) the defendant's intent in adopting its allegedly infringing mark; and 8) the strength of the plaintiff's mark. See Winship Green, 103 F.3d at 201; Star Financial, 89 F.3d at 10. No one factor is *112 determinative, and courts must evaluate the listed factors in the specific context presented by each case. See Winship Green, 103 F.3d at 201.

(i) similarity of the marks
The two marks, StreetEvents.com and StreetFusion.com, are similar in many respects. Each begins with the word "Street"  a shorthand in the financial community referring to Wall Street. And in each mark, "Street" is followed by a six-letter, two syllable word. The syncopation is the same. While the marks share ".com", this suffix is not a relevant part of the mark, because ".com" is a generic locator for domain names of web sites dedicated to commercial use. See Hard Rock Cafe Int'l v. Morton, 1999 WL 717995, at *23 (S.D.N.Y.1999) (finding that suffix ".com" has no trademark significance.)
C-call points out that the parties use vastly different design, layout, and color schemes on their web pages and in their promotional materials. In evaluating the similarity of the service marks in the context of a web site, the Court must examine their appearance in the web site in order to evaluate the likelihood of consumer confusion. The Alta Vista Corp. Ltd. v. Digital Equipment Corp., 44 F.Supp.2d 72, 76 (D.Mass.1998) ("Alta Vista"). For those customers who receive information on the services via these sources, then, the similarity of the marks is diluted by their distinct appearances. Nonetheless, for those customers who hear about the services via telemarketing, the two marks are quite similar. This factor weighs in favor of plaintiff, but less strongly so because of the differences in the web site.

(ii) similarity of the services

(iii) relationship between parties' channels of trade

(iv) relationship between the parties' advertising

(v) classes of prospective purchasers
These factors are typically considered as a group. See Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir.1983) ("Astra Pharmaceutical"); Pignons S.A. de Mecanique v. Polaroid Corp., 657 F.2d 482, 488 (1st Cir.1981). StreetEvents.com and StreetFusion.com have engaged in similar marketing strategies, advertisements, and methods of collecting their information. Their target customer groups are also virtually indistinguishable. With some minor variations, these start-up companies offer nearly identical services, and are struggling head-to-head to gain dominance in a market niche.
Both companies serve as the "middle man" linking the investor relations ("IR") departments of large publicly traded companies with investment professionals (portfolio managers, industry analysts, and the like) in institutional investment firms. Both StreetEvents.com and StreetFusion.com work directly with IR departments, collect information on earnings events and upcoming conference calls, and make this information available to investment professionals via their web sites. Each allows its subscribers to customize the content of the information received. Each offers an e-mail service to keep subscribers updated on last-minute changes in earnings events and conference calls. StreetFusion.com was first to offer live broadcasts of conference calls at its site, but StreetEvents.com is following suit.
In launching their new businesses, both companies have taken a similar approach to marketing and advertising. Both have sought new subscribers by telemarketing to IR departments as well as investment professionals. Both have developed brochures and data sheets detailing their services, conducted mailings to IR groups and investment firms, produced press releases, advertised in industry journals, obtained publicity through industry news sources, and attended conferences to promote their services. Both companies, of course, use their web sites to update subscribers on *113 the latest changes and enhancements to their services. These factors weigh in favor of plaintiff.

(vi) evidence of actual confusion
Plaintiff has offered the affidavits of several of its employees describing up to twenty incidents where subscribers and investment professionals confused StreetEvents.com with StreetFusion.com in June and July 1999. Defendant has moved to strike these affidavits, alleging that they either contain inadmissible hearsay or are overly vague. Plaintiff's affidavits contain sufficiently reliable and relevant information to overcome defendant's hearsay objection. See Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26 (1st Cir.1986) (finding reliance on hearsay appropriate in the context of an expedited preliminary injunction proceeding). Moreover, defendant was allowed to depose the affiants. Statements of customer confusion in the trademark context fall under the "state of mind exception" to the hearsay rule. See Fed.R.Evid. 803(3); Fun-Damental Too Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 1003-1004 (2nd Cir. 1997) (admitting sales manager's statements relating customer complaints as being probative of customer confusion); Armco, Inc. v. Armco Burglar Alarm Co., Inc., 693 F.2d 1155, 1160 n. 10 (5th Cir. 1982) (allowing plaintiff's employees to testify to misdirected calls where probative of customer confusion).
The relevant type of confusion is that which occurs among the purchasers of a product or service. See Astra Pharmaceutical, 718 F.2d at 1206 (stating, "[i]f likelihood of confusion exists, it must be based on the confusion of some relevant person"); Winship Green, 103 F.3d at 201 (finding that infringing conduct must be likely to confuse "an appreciable number of reasonably prudent purchasers exercising ordinary care"). Where the relevant purchaser group is sophisticated, where the goods and services are expensive, and where the purchase decision is made after careful consideration, there is less likelihood of confusion. See Astra Pharmaceutical, 718 F.2d at 1206-07. Moreover, de minimus confusion, which is easily resolved, and does not affect the ultimate purchase decision, is of minimal relevance. See Alta Vista, 44 F.Supp.2d at 79 (dismissing relevance of incidents of confusion where the confusion "did not run deep" and did not affect the ultimate purchase or sale); Lang v. Retirement Living Publishing Co., Inc., 949 F.2d 576, 583 (2nd Cir. 1991) (finding confusion irrelevant where plaintiff supplied no link between confusion and eventual purchase decision).
CCBN has not demonstrated a likelihood of confusion among this sophisticated purchasing population that impacts the ultimate purchase decision. While CCBN has demonstrated multiple incidents of confusion involving these two similar service marks, (i.e., a prospective subscriber who mistook the sponsor of a promotional party, a misdirected fax, etc.), it has not shown that this confusion persists at the key point of the purchasing decision by sophisticated investment professionals. Defendant has submitted evidence that the purchasing decision process has spanned up to six months. It involves collecting extensive input and conducting technical evaluation. Moreover, defendant now charges up to $400,000 for a one-year subscription. Plaintiff charges nothing for a beta version. It is simply unrealistic to conclude that any initial confusion over service marks would translate into "actual confusion in purchasing the parties' products." Astra Pharmaceutical, 718 F.2d at 1207-1208. See also Star Financial, 89 F.3d at 9 (stating, "confusion about source exists when a buyer is likely to purchase one product in the belief she was buying another ..."). This factor weighs heavily against plaintiff.

(vii) defendant's intent in adopting the mark
Plaintiff argues that c-call intended to confuse potential subscribers based on evidence *114 that (1) defendant was previously offering its services under c-call.com, and then later switched to StreetFusion.com after "several months of aggressive promotion" by StreetEvents.com; (2) defendant made the alleged false statement that it was the "first and only" Internet-based calendaring service; and (3) defendant engaged in similar name-switching tactics when it derived its prior name, c-call, from the mark of another competitor, VCALL. com.
These parties co-exist in a very narrow, if not a two-player, market. While defendant (now) concedes it was aware of StreetEvents.com's existence when it adopted the StreetFusion.com mark, it does not necessarily follow that defendant acted with an intent to confuse or deceive prospective purchasers. See NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F.Supp. 861, 866 (D.Mass.1989) (citing Ziebart Int'l Corp. v. After Market Associates, Inc., 802 F.2d 220, 221 (7th Cir.1986)) (finding that "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith.") There is no evidence in this record of "aggressive" marketing by plaintiff in early 1999 which would create enough good will for defendant to try to usurp.
As for the "first and only" language contained on defendant's site, this language was carried over from its previous c-call.com site, which did pre-date the existence of StreetEvents.com. Defendant admits now it is not the "only" such site and has withdrawn the language.
Finally, the record is inadequate to draw bad faith conclusions from the circumstances surrounding defendant's original adoption of its previous name, c-call.

(viii) strength of the mark
In determining the strength of plaintiff's StreetEvents.com mark, this Court looks first to its classification along an established continuum of "distinctiveness." Service marks are classified, in ascending order of eligibility for protection, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary and fanciful. See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) ("Two Pesos"); Calamari Fisheries, Inc. v. The Village Catch, 698 F.Supp. 994, 1006 (D.Mass.1988) ("Calamari Fisheries") (citing S.S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 696 (1st Cir.1979)).
Since there is no evidence suggesting plaintiff's mark is either generic or, at the other extreme, arbitrary and fanciful, I examine the two intermediate categories, descriptive and suggestive. A descriptive mark expresses a characteristic of the service to which it refers, and does not require a consumer to use her imagination or perceptive powers to determine its meaning. See Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 375 n. 8 (1st Cir.1980) ("Keebler"); Calamari Fisheries, 698 F.Supp. at 1006-1007; Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc., 561 F.Supp. 1014, 1020 (D.R.I.1983) ("Railroad Salvage"). In order to be entitled to protection under the Lanham Act, the owner of a descriptive mark must show that a "secondary meaning" has developed, such that a consumer associates that mark with a particular service. Calamari Fisheries, 698 F.Supp. at 1007. A suggestive mark connotes, rather than describes, a service, and requires a consumer to use her imagination to determine the nature of that service. See Calamari Fisheries, 698 F.Supp. at 1007; Keebler, 624 F.2d at 375 n. 8; Railroad Salvage, 561 F.Supp. at 1020. In determining whether a mark is descriptive or suggestive, courts consider the extent to which it has been used by others in the same field. See Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F.Supp. 404, 414 (D.Mass.1991) ("Bayshore Group"). However, the ultimate designation is frequently made "on an intuitive basis, rather than as a result of logical analysis susceptible of articulation." Calamari Fisheries, 698 F.Supp. at 1008.
*115 I agree with plaintiff that its mark is suggestive, rather than descriptive. The two elements, "Street" and "Events," simply do not  without further use of one's imagination  describe the characteristics of plaintiff's services. Although as defendant has shown, many other web-based businesses use the term "street" to refer to Wall Street, there are other businesses which use "street" in other contexts. Upon encountering the StreetEvents.com mark, one would need to intuit that "street" here referred to Wall Street, and "events" referred to that part of plaintiff's service which lists corporate earnings events and conference calls. Given that StreetEvents.com is a suggestive mark, plaintiff need not show secondary meaning because suggestive marks are inherently distinction. See Two Pesos, 505 U.S. at 768, 112 S.Ct. 2753.
However, courts consider other factors in determining the overall strength of a mark, including: whether the mark is registered; how long it has been in use; whether it has been widely promoted; and whether it has "renown in the relevant field of business." Alta Vista, 44 F.Supp.2d at 79. These additional factors are useful here in assessing the strength of plaintiff's mark.
First, although both plaintiff and defendant have applied to register their respective marks, plaintiff did not do so until June 22, 1999, and there is no indication in the record that a notice of allowance has issued to either company. See 15 U.S.C. § 1501. Second, the dispute over priority of use, described above, underscores the fact that plaintiff's mark has not been in use very long. The longest period which plaintiff may reasonably claim to have used the mark is about nine months, since January of 1999. Defendant, on the other hand, has been using its mark for about six months. It may be true that the Internet has accelerated the pace at which on-line companies become household words. But there is little evidence here that, in the rough-and tumble world of Internet companies, CCBN's slight edge in using the StreetEvents.com mark allowed it to gain renown or widespread recognition within the field. Finally, while CCBN has engaged in aggressive marketing strategies to promote its mark since May, 1999, there is little indication of just how well known the StreetEvents.com mark was within the field in early 1999.
Weighing the above factors, this Court finds that the StreetEvents.com mark is not strong because of the short time it has been in use and the common use of the word "street" in the financial world. Moreover, "the muscularity of a mark, in and of itself, does not relieve the mark-holder of the burden to prove a realistic likelihood of confusion." Winship Green, 103 F.3d at 206 (finding that "the mark's strength cannot carry the day" where plaintiff did not produce evidence showing realistic likelihood of confusion); Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 5 (1st Cir.1993) (stating that despite strength of mark, any remedy issued must be directed to eliminating likelihood of confusion); Bayshore Group, 762 F.Supp. at 414 (weighing other factors and finding no likelihood of confusion despite relatively strong mark).
In sum, plaintiff has not presented sufficient evidence that it is likely to succeed on the merits in establishing a realistic likelihood of confusion created by defendant's use of the StreetFusion.com mark.

3. False Advertising

The second issue in Plaintiff's motion for a preliminary injunction concerns its allegation that defendant has engaged in false and misleading advertisement in violation of 15 U.S.C. § 1125(a)(1). Plaintiff objects to defendant's statement on its web page that it is the "first and only Internet-based information exchange for the financial community." While defendant may have been the first such company, it was not the only one. Defendant has since removed this language, and thus the request for injunctive relief is moot.

*116 ORDER

Plaintiff's motion for a preliminary injunction (Docket 2) is DENIED.
NOTES
[1] The complaint alleges unfair competition in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(Count I); false advertising in violation of 15 U.S.C. § 1125(a)(1)(Count II); common law unfair competition (Count III); state trademark infringement (Count IV); dilution, in violation of Mass.Gen.L. ch. 110B, § 12 (Count V); and unfair trade practices in violation of Mass.Gen.L. ch. 93A(Count VI).
[2] 15 U.S.C. § 1125(a) provides in relevant part that: (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

"(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...
shall be liable in a civil action..."
[3] The "beta" designation, according to plaintiff, was simply an indicator that it was not yet charging for the service. Defendant asserts that the term "beta" means "not fully functional" and "still being tested." This Court has searched for a definition of this ubiquitous piece of computer jargon. Though it appears that Oxford and Webster have not yet come on board fully with the computer age, a somewhat unconventional online resource, "The Jargon Lexicon" contained this definition:

"beta" ... /n./ 1. Mostly working but still under test; usu. used with `in': `in beta' ... 2. Anything that is new and experimental ... 3. Flaky; dubious; suspect (since beta software is notoriously buggy.) The Jargon Lexicon, (visited Oct. 6, 1999) http://www.wins.uva.n1/es/jargon/b/beta.