THIS DISPOSITION
IS CITABLE
AS PRECEDENT OF
THE TTAB

Mailed:
19 April 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

National Rural Electric Cooperative Association
v.
Suzlon Wind Energy Corporation

_____

Cancellation No. 92043377

_____

James R. Menker of Smith, Gambrell & Russell, LLP for the National Rural Electric Cooperative Association.

Jay S. Horowitz, Esq. for Suzlon Wind Energy Corporation.

_____

Before Bucher, Holtzman, and Drost, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

Respondent Suzlon Wind Energy Corporation is the owner

of Registration No. 2,811,396 for the mark:



for "wind turbines and their components, namely, nacelle,

gearbox, generator, control system, hub, tower, and blades

in Class 7.  The registration resulted from application

Serial No. 76399388, filed April 23, 2002.  It alleged

dates of first use of May 1, 2003, and the registration

issued on February 3, 2004.

Petitioner National Rural Electric Cooperative

Association (NRECA), on June 10, 2004, petitioned to cancel

respondent's mark.  Petitioner is the owner of Registration

No. 2,205,808, which issued November 24, 1998, for the mark:



for the following goods and services:

Lapel pins in Class 14

Periodical publications, namely newsletters, magazines,
and information bulletins in the field of rural
electrification, and pens and pencils in Class 16

Conducting educational workshops, seminars and training
programs, and management, law, and labor relations
update seminars and lectures, in the field of rural
electrification in Class 41

Association services, namely, promoting the interests
of the rural electrification industry and members of
rural electric cooperatives in Class 42.

The registration is based on application Serial No.

75409381, filed December 22, 1997.  The registration claims

a date of first use and first use in commerce for all the

2

classes of January 1988. Affidavits under Sections 8 and 15 have been accepted or acknowledged.

Petitioner alleges that the "conditions surrounding the marketing of the goods and services set forth in Reg. No. 2811396 and the goods set forth in … Reg. No. 2205808 are such that they could be encountered by the same purchasers under circumstances that could give rise to the mistaken belief that the goods and/or services come from a common source." Petition at 2. Respondent denied the salient allegations of the petition to cancel.

## The Record

The record consists of the following items: the file of the involved registration; the testimony deposition of petitioner's director of conference program planning, Valerie Parks; and status and title copies of petitioner's registration submitted by petitioner under a notice of reliance.

## Priority

Inasmuch as both petitioner and respondent own registrations, petitioner does not necessarily have priority simply because it owns a registration. Brewski Beer Co. v. Brewski Brothers, Inc., 47 USPQ2d 1281, 1284 (TTAB 1998) (The "Board has taken the position, in essence, that the registrations of each party offset each other; that petitioner as a plaintiff, must, in the first instance,

establish prior rights in the same or similar mark … Of course, petitioner or respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date"). In this case, because respondent has not submitted any evidence of an earlier priority date, the earliest date upon which it can rely is the filing date of its application (April 23, 2002). Intersat Corp. v. International Telecommunications Satellite Organization, 226 USPQ 154, 156 n. 5 (TTAB 1985) ("The earliest date of first use upon which Intelsat can rely in the absence of testimony or evidence is the filing date of its application"). Inasmuch as petitioner's underlying application was filed on December 22, 1997, petitioner has priority.

## Likelihood of Confusion

We now consider the central issue in this appeal, i.e., whether respondent's SUZLON and design mark when used on wind turbines and components is confusingly similar to petitioner's design mark used on lapel pins; publications; workshops, seminars and training programs; and association services. In arriving at a conclusion in likelihood of confusion cases, we consider the facts as they relate to the relevant factors set out in such cases as In re Majestic Distilling Co., 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003); In re E. I. du Pont de Nemours & Co., 476 F.2d

1357, 177 USPQ 563, 567 (CCPA 1973); and Recot, Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1896 (Fed. Cir. 2000).

We begin our analysis by comparing the parties' marks.

 

We note that a "[s]ide by side comparison is not the test." Grandpa Pidgeon's of Missouri, Inc. v. Borgsmiller, 477 F.2d 586, 177 USPQ 573, 574 (CCPA 1973). However, because the marks include designs, it is helpful to observe the marks together so that their similarities and differences can be determined. When we do compare the marks, it is clear that the marks are similar to the extent that both marks contain dark, circular designs.[1]

The circle design is hardly particularly distinctive in trademark designs. In re Anton/Bauer Inc., 7 USPQ2d 1380, 1381 (TTAB 1988) ("In particular, common geometric shapes such as circles, ovals, triangles, diamonds and stars, when used as backgrounds for the display of word or letter marks,

---

[1] Petitioner's witness asserts that respondent's mark is used in a similar green color. Parks dep. at 69 ("Primarily it appears in green, a green that's very similar to, if not the same as, the NRECA logo").

are not regarded as trademarks for the goods to which they are applied absent evidence of distinctiveness of the design alone"). Both marks are also mostly shaded. Another feature that the marks share are several lines. Respondent's mark contains three identical lines that have one bend. Petitioner's mark contains five lines. Three of the lines are nearly the same and two other lines are different.

Petitioner's style manual describes its trademark as follows: "The NRECA symbol was designed to represent electric lines crossing the green rolling hills of America's countryside." Parks dep. Ex. 15 at 000119. Respondent describes its marks (Brief at 5) as "the 'SUZLON' wording along with the 'S' design composed of three 'S-shaped' zigzagging lines in a circle." Respondent's design certainly would not suggest a countryside scene. Also, while petitioner argues that both "parties use the zig-zagging lines to connote electricity or dynamic movement," (Brief at 15), because the parties are involved in the field of electrification as the supplier of turbines or as an association of rural electrical cooperatives, the designs are suggestive of the goods, and therefore, to the extent that consumers would view both designs as suggesting electricity, such a similarity in connotation does not mandate a finding that the marks are similar. Furthermore,

regardless of what the parties may have intended, the designs are somewhat abstract, and therefore it is not clear that consumers would view them as suggesting electricity. Instead, both marks "could easily suggest a number of different things to prospective purchasers." Ocean Spray Cranberries, Inc. v. Ocean Garden Products, Inc., 223 USPQ 1027, 1029 (TTAB 1984).

Before we conclude our discussion of the marks, we would be remiss if we did not emphasize that an important difference between the two marks is that respondent's mark is not simply a design. In addition to the design, respondent's mark also contains the apparently arbitrary word SUZLON. This word is a prominent part of respondent's mark inasmuch as it could be pronounced and it would be used to verbally describe the source of wind turbines and their components. Petitioner argues that "[m]any members display their name underneath the NRECA logo… Suzlon can easily be mistaken for a member of the electric cooperative using its trade name underneath the NRECA logo." Brief at 17. However, respondent is not using its mark in connection with association services or seminars in the field of rural electrification. Respondent is using its mark to indicate the source of wind turbines and their components, not

services associated with electric cooperatives.[2] Merely because petitioner is an association does not mean that potential members of its association are likely to assume that all somewhat similar marks on electricity generating products are somehow associated with petitioner. Therefore, we cannot discount the significance of the arbitrary word in respondent's mark when it is used as a trademark for its goods.

It is critical that we compare the marks in their entireties because that is how customers will perceive them. When we do this, we must keep in mind that "[h]uman memories even of discriminating purchasers … are not infallible." In re Research and Trading Corp., 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986), quoting, Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd., 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970). Here, even taking into consideration the fallibility of memory, when we compare the marks, we conclude that they are only somewhat similar in appearance, meaning, and commercial impression inasmuch as the designs contain circular designs that are suggestive of

---

[2] We point out that respondent's registration includes only goods in Class 7. While petitioner refers to respondent's training services (Brief at 26), we must consider these services to be simply ancillary services involved with the purchase of respondent's wind turbines and associated products. The record does not indicate that this brochure was submitted earlier, therefore it is not properly of record. We add that even if it had been made of record earlier, the fact that respondent provides these ancillary services does not support a conclusion that confusion is likely.

electricity.  They are different because respondent's mark contains an arbitrary word and its lines do not suggest the countryside as petitioner's mark does.  In re Coors Brewing Co., 343 F.3d 1340, 68 USPQ2d 1059, 1062 (Fed. Cir. 2003) ("Although we uphold the Board's finding that the two marks are generally similar, principally because they both use the term 'Blue Moon,' we note that similarity is not a binary factor but is a matter of degree").  Here, the degree of similarity is not great.

The next factor we consider is whether the goods and services of the parties are related.  It is well established that we consider the goods and services as they are described in the identification of goods and services in the registrations.  Paula Payne Products v. Johnson Publishing Co., 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973).

Respondent's goods are wind turbines and their components, namely, nacelle, gearbox, generator, control system, hub, tower, and blades.  Petitioner's goods include lapel pins and newsletters, magazines, and information bulletins in the field of rural electrification, and pens and pencils.  Its services include conducting educational workshops, seminars and training programs in the field of rural electrification and association services promoting the interests of the rural electrification industry and members of rural electric cooperatives.  It is clear from even a

9

cursory review of the parties' goods and services that they are neither identical nor closely related. There are no obvious connections between the source of lapel pins, publications, seminars and association services, even if they concern electrification, and the source of wind turbines, other than the fact that wind turbines may be featured in publications or discussed at seminars involving electrification. However, that is not the end of the discussion on the relatedness of the goods and services.

> It "has often been said that goods or services need not be identical or even competitive in order to support a finding of likelihood of confusion. Rather, it is enough that goods or services are related in some manner or that circumstances surrounding their marketing are such that they would be likely to be seen by the same persons under circumstances which could give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same producer or that there is an association between the producers of each parties' goods or services."

In re Melville Corp., 18 USPQ2d 1386, 1388 (TTAB 1991). See also Time Warner Entertainment Co. v. Jones, 65 USPQ2d 1650, 1661 (TTAB 2002).

Petitioner argues (Brief at 19) that the marks "are used on directly competitive goods and services." Specifically, petitioner maintains (Brief at 20) that:

> "NRECA helps member co-ops evaluate renewable energy resources like wind as they promote fuel diversity and power supply." See Parks Dep. at 82. NRECA's interest in wind power was documented in April of 2003 when NRECA produced a white paper on the topic. The white paper provided an overview of wind power as an alternative energy source for co-operatives and

10

documents that it is the fastest growing form of renewable energy in America.  Recognizing that a focus on the environment is of primary importance, this document was designed to provide co-ops with an objective overview of wind energy as a technology for them to investigate and research as an alternative energy source.

Respondent admits (Brief at 8) that "the goods and services used with the respective marks fall in the energy industry."  Indeed, inasmuch as the parties operate in the same general area, it is not surprising that their paths do occasionally cross at trade seminars and policy group meetings.  However, these common interactions do not make wind turbines related to association services.  If this were the case, goods and services in such fields as the computer and snack food industry would almost always be held to be related even though our case law oftentimes arrives at the opposite conclusion.  Merely because parties operate in the same broad industry does not, by itself, establish that their goods and services are related. Saks & Co. v. Snack Food Association, 12 USPQ2d 1833, 1835 (TTAB 1989) ("Merely because opposer sells what can be characterized as snack foods, even snack foods bearing the 'SFA' logo, in its retail establishments, does not create a sufficient nexus with the association services applicant renders to the snack food industry"); In re Quadram Corporation, 228 USPQ 863, 865 (TTAB 1985) ("[W]e think that a per se rule relating to source confusion vis-a-vis computer hardware and software

11

is simply too rigid and restrictive an approach and fails to consider the realities of the marketplace").

When we look at petitioner's evidence, we do see an example of where there is potential for overlap, and it occurs among members or potential members of petitioner's association and suppliers of wind turbines.  An example of this overlap is in Kotzebue, Alaska.[3]  See Parks dep. Ex. 7. The Kotzebue Electric Association is a member of the National Rural Electric Cooperative Association and it displays petitioner's mark on its literature.  Parks Dep. Ex. 7.  The exhibit is entitled "The Kotzebue Wind Energy Project."  In the brochure, the Kotzebue Electric Association (KEA) describes how KEA "raised three 66-kilowatt turbines high above the expansive Arctic horizon, seeding the first utility wind farm in Alaska.  The turbines were soon harnessing piercing winter winds, producing electricity for local homes and heralding the potential for a brighter energy future for remote communities."  The Kotzebue Electric Association would therefore be a user of petitioner's services as well as a member of petitioner's association.  It would also be a potential purchaser of respondent's wind turbines.

---

[3] Kotzebue is a town of 3000 residents located in northwest Alaska approximately 550 air miles from Anchorage.  Parks Dep. Ex. 7.

As the provider of electric power to Kotzebue, KEA presumably purchases numerous goods and services. However, we simply do not have evidence to conclude that KEA and other cooperatives would assume that all goods and services are associated with petitioner simply because such goods and services are all involved with producing electricity. Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1310 (Fed. Cir. 2002) (A "broad general market category is not a generally reliable test of relatedness of products"). Therefore, we find that petitioner's association services and its services involving conducting educational workshops, seminars and training programs, and management, law, and labor relations update seminars and lectures in the field of rural electrification, are at best only tenuously related to wind turbines and component parts. As for petitioner's lapel pins and publications, petitioner has not established any relationship between these goods and wind turbines. Coors Brewing, 68 USPQ2d at 1064 ("[D]egree of overlap between the sources of restaurant services and the sources of beer is de minimis").

Other factors that we take into consideration are the sophistication of the purchasers and the care with which purchases are made. The decision to purchase a wind turbine is a decision that requires careful consideration by knowledgeable purchasers. Petitioner's literature (Parks

13

Dep. Ex. 12 at 002011-12) describes some of the cost and details involved in purchasing and installing wind turbines:

> New wind turbines being installed in wind farms are very large. A typical 650-kW unit has rotors that measure about 155 feet (approximately 50 meters) – more than half the length of a football field – and towers 215 feet tall. Foundations for these units require holes 30 feet deep and 14 feet in diameter…
>
> A typical wind farm can be installed in a remote location within a two-year period, although building transmission capacity to transport the electricity to load centers could take a much longer time…
>
> The current cost for wind turbine installation of large wind farms is approximately $900 to $1000 per kW. For smaller installations, the cost for wind turbines is $1200 to $1300 per kW. Small units for individual farms or businesses (10-kW turbines) could run as high as $3000 per kW.

Similarly, the decision to join an association promoting the interests of the rural electrification industry or to attend training in this area is not likely to be made lightly. Joining an association promoting rural electrification or using their services as well as purchasing wind turbines would involve sophisticated purchasers who are not making ordinary or impulse purchases. Indeed, these purchases are likely be made after careful consideration. Therefore, these factors favor respondent.

Petitioner also alleges that there has been actual confusion between petitioner's and respondent's marks. "A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion." Majestic Distilling Co., 65 USPQ2d at 1205.

Here, petitioner argues that there "has been at least one incident of actual confusion… Actual confusion occurred when the general counsel and government relations director of the <u>South</u> Dakota Rural Electric Association first viewed Suzlon's mark." Brief at 28 (underlining added). Petitioner's conclusion is based on an email from Harlan Fuglesten, who is the General Counsel and Government Relations Director for the <u>North</u> Dakota Association of Rural Electric Cooperatives. In this email (Parks dep. Ex. 24), Mr. Fuglesten reports that:

> I happened to notice an ad today for Suzlon Energy, a wind energy company, which has as its logo a green ball with three jagged lines running through it. At first, I thought it was an NRECA ad. I just wondered if anyone had looked at this for possible trademark infringement. You can see the logo by going to Suzlon's website at <u>www.suzlon.com</u>.

> Respondent (Brief at 7) argues that this "testimony did not involve a consumer in the marketplace, but rather the general counsel of one of Petitioner's cooperatives."[4] We

---

[4] Respondent also refers to the statement as hearsay, but we can consider testimony concerning employee's statements about actual confusion as an exception to the hearsay rule. <u>CCBN.com Inc. v. c-call.com Inc.</u>, 53 USPQ2d 1132, 1137 (D. Mass. 1999) ("[S]tatements of customer confusion in the trademark context fall under the 'state of mind exception' to the hearsay rule. See Fed. R. Evid. 803(3)"). In addition, letters (or their electronic equivalent, email) from customers are also recognized as an exception to the hearsay rule. <u>International Kennel Club of Chicago v. Mighty Star Inc.</u>, 846 F.2d 1079, 6 USPQ2d 1977, 1985 (7th Cir. 1988) (The "weight of authority allows the admission of letters directed to the plaintiff where the evidence contains factual data (beyond a mere legal conclusion) that is material to the issue of the likelihood of confusion"). <u>See also</u> <u>Freddie Fuddruckers, Inc. v. Ridgeline, Inc.</u>, 589 F. Supp. 72, 223 USPQ 1139, 1141 (N.D. Tex. 1984) ("Hearsay letters and

are not persuaded that this single instance of alleged actual confusion is significant.  Mr. Fuglesten's email seems to indicate that he mistakenly believed that the mark was petitioner's without considering the goods and services.  Indeed, when the ad was viewed in its entirety, Mr. Fuglesten arrived at the conclusion that the marks as used on the respective goods and services did originate from different sources.  Therefore, we find this equivocal email does not require us to conclude that there is a likelihood of confusion.

On the factor of fame, we note that petitioner has provided some evidence that while it does not have a "budget for the green ball logo, per se; however, given that this logo appears on – gosh, on all of our websites, that it appears on every piece of print and collateral material that NRECA produces, I think it's pretty safe to say that budget is in excess of a million dollars per year."  Parks dep. at 53.  However, the same witness (Id.) "wouldn't characterize it as famous."  While we agree that petitioner's mark is not famous, petitioner's evidence does demonstrate that its mark is not weak.

---

statements of customers are admissible in evidence under Fed. R. Evid. Rule 803(3) where they reveal the then existing state of mind of the writers and speakers and their state of mind is relevant to the case"), aff'd mem., 783 F.2d 1062 (5th Cir. 1986).

Another point we consider is that "a presumption of validity attaches to a service mark registration, and the party seeking cancellation must rebut this presumption by a preponderance of the evidence." West Florida Seafood Inc. v. Jet Restaurants Inc., 31 F.3d 1122, 31 USPQ 1660, 1662 (Fed. Cir. 1994). Viewed in this light, we determine that petitioner has not met its burden of demonstrating that there is a likelihood of confusion. The marks are far from identical. Respondent's mark contains an arbitrary word and the designs are not the same. Even if prospective purchasers may at first glance see the marks as consisting of similar dark circles with zigzagging lines, when the marks are considered in relation to the relevant goods and services, confusion is not likely. Wind turbines and association services and seminar and update services are barely related. When we also consider that these goods and services would be purchased by knowledgeable purchasers after some thought, there is even less reason to believe that confusion is likely.

Decision: The petition to cancel is denied.